STATE OF CONNECTICUT *v.* MARC S. SINVIL
(SC 17021)

Sullivan, C. J., and Norcott, Palmer, Vertefeuille and Zarella, Js.

(*One justice concurring separately; one justice dissenting*)

Argued April 19—officially released August 10, 2004

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *Kevin T. Kane*, state's attorney, *David Smith*, deputy assistant state's attorney, and *Ronald Weller*, assistant state's attorney, for the appellant (state).

*Carlos E. Candal*, special public defender, with whom, on the brief, was *Mark Rademacher*, for the appellee (defendant).

*Opinion*

NORCOTT, J. The principal issue in this certified appeal is whether the Appellate Court, in reversing the defendant's judgment of conviction of one count of sexual assault in the fourth degree in violation of General Statutes § 53a-73a and one count of unlawful restraint in the second degree in violation of General

Statutes § 53a-96, properly concluded that certain remarks made by the prosecutor during the rebuttal phase of closing arguments deprived the defendant of his due process right to a fair trial, as protected by the federal constitution.[1] On appeal, although conceding that the remarks were improper, the state claims that the Appellate Court improperly concluded that they deprived the defendánt, Marc S. Sinvil, of his federal due process right to a fair trial. We agree with the state. Accordingly, we reverse the judgment of the Appellate Court.

The jury reasonably could have found the following relevant facts, as set forth in the opinion of the Appellate Court. "The defendant and the victim's husband, B,[2] had been friends for several years. The defendant came to know the victim, A, through his relationship with B. All three were originally from Haiti. After having known each other for several years, the defendant and A's family moved to Norwich at approximately the same

---

[1] The briefs fail to indicate whether, at the Appellate Court, the defendant relied upon the due process clause of the federal constitution, the state constitution, or both. To the extent that the defendant relied upon his state constitutional right to due process of law; Conn. Const., art. I, § 8; we decline to review the claim because there has been no independent analysis of the state constitutional issue, either before this court or before the Appellate Court. State v. Coney, 266 Conn. 787, 791 n.5, 835 A.2d 977 (2003). "We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim . . . ." (Internal quotation marks omitted.) State v. Smith, 255 Conn. 830, 835 n.12, 769 A.2d 698 (2001). We therefore regard the defendant's claim as arising under the fourteenth amendment to the United States constitution, § 1, which provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[2] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim by name, or others through whom the victim's identity may be ascertained. We therefore refer to the victim and her husband as A and B, respectively. See General Statutes § 54-86e, as amended by Public Acts 2003, No. 03-202, § 15.

time. The friendship between the defendant and B was such that B gave the defendant a key to his family's apartment. The defendant would visit B almost every day. The defendant and B would play cards together at B's apartment, and the defendant frequently had meals there. Using the key given to him, the defendant also would spend time at his friend's apartment even when B and A were not there.

"In time, both the defendant and B obtained jobs at Foxwoods Casino. The defendant worked as a bus driver, and his scheduled working hours were generally from 4 p.m. until approximately midnight.[3] B worked in a different department and usually was scheduled to work until 2 a.m.

"A and the defendant were the two principal witnesses at trial. A testified that at approximately 12:30 a.m. on September 28, 1999, she was sleeping alone in the bedroom she shared with B, while her two sons were sleeping in an adjacent bedroom. A testified that she awoke to find somebody behind her in bed. At first, she believed it to be B, but she turned and discovered that it was the defendant. According to her, she and the defendant struggled, during which time the defendant told her that he loved her and he wanted to have sex with her. She related that the defendant held her hands down as he touched her under her nightgown. At some point, A could feel the defendant becoming aroused. A managed to calm the defendant, and she was able to get to her bathroom and lock herself inside. The defendant stayed for a short time, calling to A from outside of the bathroom, but he eventually left. When B got home from work at approximately 2:30 a.m., A did not tell him what had happened that night.

"Approximately two days later, after speaking about the incident with two coworkers and B, A did contact

---

[3] The defendant testified that on the night of the incident he worked until 11:30 p.m.

the police. The defendant was arrested and charged with sexual assault in the fourth degree and unlawful restraint in the second degree.

"The defendant testified on his own behalf at trial. According to the defendant, he and A had engaged in a continuing consensual extramarital sexual affair over several months. The defendant testified that A and B argued frequently, and that she had turned to their mutual friend, the defendant, for comfort. He claimed that the incident of September 28 was actually a consensual sexual encounter which began in A's kitchen, where she met the defendant that night, and proceeded to the bedroom. At trial, the defendant maintained that A had accused him of attacking her to protect her reputation in the community." *State* v. *Sinvil*, 76 Conn. App. 761, 763–64, 821 A.2d 813 (2003).

The jury thereafter convicted the defendant of one count of sexual assault in the fourth degree and one count of unlawful restraint in the second degree. After the defendant's motion for judgment of acquittal notwithstanding the verdict was denied, the trial court rendered judgment in accordance with the jury verdict. The trial court then sentenced the defendant to a term of two years imprisonment, execution suspended after eight months, as well as a term of ten years probation and mandatory sex offender registration. Subsequently, the trial court denied the defendant's motion for sentence modification.

On appeal to the Appellate Court, the defendant claimed, in part, that the prosecutor had committed misconduct by improperly commenting on facts that were not in evidence during the rebuttal phase of his closing argument. Id., 769. Specifically, the defendant contended that the prosecutor improperly had made statements regarding his own physical condition and

questions that he should have asked A during the trial,[4] and that the improper statements adversely had impacted the defendant's right to a fair trial. Id. The Appellate Court agreed with the defendant both that the statements were improper; id., 771; and that the improprieties violated his due process right to a fair trial such that a reversal of his judgment of conviction was warranted. Id., 774. We subsequently granted the state's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly

[4] During the rebuttal phase of his closing arguments, the prosecutor made the following comments, which have been preserved for appeal:

" '[Prosecutor]: [I]f a man comes into the apartment while you're sleeping and he gets into bed with you and if, whether her statement is true, she didn't expect it, she didn't invite him, pins her down, holds her down, I believe, and fondles her breasts, that's not a minor incident. I think she said she was afraid something more was going to happen. That's a pretty major incident. That's pretty, pretty horrendous, actually, if you think about what's happening; even more horrendous if the kids were in the other room. She doesn't know what's going to happen to the kids. It makes perfect sense that she's not going to scream out, because she—and I'll—I'll tell you—

" '[Defense Counsel]: Objection.

" '[Prosecutor]:—a large portion of this trial I was kind of burnt out on what was going on. I was having a hard time focusing.

" '[Defense Counsel]: Objection.

" '[Prosecutor]: I probably should have asked her why she didn't scream—

" 'The Court: What? Is there an objection? What?

" '[Defense Counsel]: I don't—his personal statement.

" 'The Court: His personal statement when you're going, "I believe," "I hope." Yes, making personal statements is objectionable.

" '[Prosecutor]: Okay. I don't think I made a mistake on credibility. I just think that my failure to do something—

" 'The Court: All right. Because you haven't. You haven't.

" '[Prosecutor]: Okay. It should have been asked of her about the kids. I—I missed—I should have asked her, but [B] came on and said, "Room—doors—closing the room." They also sleep with the television on a lot. It makes perfect sense that he would—when he came in. There was no testimony from her or from the defendant that there was any screaming or any loud noise going on. Just that he pinned her down and she was afraid. And she was talking to him, "get off, get off. I don't want to do this," and that she was afraid that it escalated and she would be raped. So, I want you to keep that in mind. It's a pretty serious act of what happened.' " *State* v. *Sinvil,* supra, 76 Conn. App. 767–68.

reverse the defendant's conviction on the basis of prosecutorial misconduct?" *State* v. *Sinvil*, 264 Conn. 916, 826 A.2d 1160 (2003).

## I

## PROSECUTORIAL MISCONDUCT

The state first claims that the Appellate Court improperly concluded that the defendant's due process right to a fair trial had been violated by the acts of prosecutorial misconduct. More specifically, the state contends that the statements at issue, although improper, did not rise to the level of depriving the defendant of a fair trial. The state maintains that, pursuant to the standard articulated in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987),[5] the improper statements did not constitute a due process violation because they were: (1) invited by defense counsel's closing argument; (2) not severe; (3) an isolated instance of preserved misconduct;[6] (4) not directed toward the central issue in the case; (5) cured by the trial court's general but detailed jury instructions; and (6) outweighed by the strength of the state's case.

"[I]n analyzing claims of prosecutorial misconduct, we engage in a two step analytical process. The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that

[5] "In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) *State* v. *Williams*, supra, 204 Conn. 540.

[6] The Appellate Court noted that there were other potential instances of misconduct but declined to address them because they were not properly preserved by the defendant at trial or raised on appeal. *State* v. *Sinvil*, supra, 76 Conn. App. 765.

misconduct deprived a defendant of his due process right to a fair trial. Put differently, misconduct is misconduct, regardless of its ultimate effect on the fairness of the trial; whether that misconduct caused or contributed to a due process violation is a separate and distinct question that may only be resolved in the context of the entire trial . . . ." (Internal quotation marks omitted.) *State* v. *Coney*, 266 Conn. 787, 808, 835 A.2d 977 (2003).

The first step in the analysis is whether the prosecutor's comments during closing argument constituted misconduct. We need not reach a decision on this issue because the state has conceded[7] that the prosecutor's challenged remarks were improper.[8] Accordingly, the

---

[7] The state's brief fails to address the issue of misconduct altogether other than to state that it is making its claim "[a]ssuming arguendo that these remarks were improper . . . ." The state thereafter explicitly conceded prosecutorial misconduct during oral argument before this court in the following colloquy: "The state would agree that in this case the deputy assistant state's attorney should not have stated during his rebuttal argument that he was 'kind of burnt out' and 'had a hard time focusing on the trial' and [should have] directly asked [A] why she didn't scream during the assault."

[8] Both parties' briefs focus a majority of their discussion on misconduct on the following comments by the prosecutor: "[A] large portion of this trial I was kind of burnt out on what was going on. I was having a hard time focusing," and "I probably should have asked her why she didn't scream." They also identify another remark by the prosecutor, however, from the preserved excerpt that the defendant finds objectionable, namely: "[I]f a man comes into the apartment while you're sleeping . . . that's not a minor incident. I think she said she was afraid something more was going to happen. That's a pretty major incident. That's pretty, pretty horrendous, actually, if you think about what's happening; even more horrendous if the kids were in the other room. She doesn't know what's going to happen to the kids." It is unclear whether the state intended to concede the impropriety of this statement along with the other remarks in this footnote; in any event, we do not find it to be improper.

"A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence." (Internal quotation marks omitted.) *State* v. *Ceballos*, 266 Conn. 364, 400, 832 A.2d 14 (2003). The remark in question was a response to defense counsel's characterization of the alleged assault as an illogical minor incident. "Common sense and logic just doesn't seem to tell you that [the defendant], after this long term relationship of ten years, all of a sudden

only issue for our consideration is whether the admitted misconduct deprived the defendant of his due process right to a fair trial.

The second stage of the analysis focuses on the overall fairness of the trial and whether the misconduct, in its totality, amounted to a due process violation. It is the state's position that the prosecutor's improper statements during closing argument did not rise to such a level. We agree.

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor." (Internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 457, 832 A.2d 626 (2003). "To prove prosecutorial misconduct [rising to the level of a due process violation], the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the misconduct so infected the trial with unfairness as to make the conviction a denial of due process. . . . [P]rosecutorial misconduct of constitutional proportions may arise during the course of closing argument, thereby implicating the fundamental fairness of the trial itself . . . ." (Internal quotation marks omitted.) *State* v. *Ceballos*, 266 Conn. 364, 376, 832 A.2d 14 (2003). "[I]t

decided this was the time to unlawfully restrain, in a minor type of alleged sexual assault fourth degree charge . . . ." Moreover, the prosecutor's comment finds support in the record. In response to a question about how she was feeling during the incident A stated "I feel like—I was scared. I don't know. I feel—It was awful." Additionally, "[t]he mere use of phrases such as 'I would think,' 'I would submit,' and 'I really don't think,' does not transform a closing into the improper assertions of personal opinion by the state's attorney." *State* v. *Coney*, supra, 266 Conn. 814. If it did, defense counsel would be guilty of the same misconduct. Defense counsel stated: "I feel the state has not come close to meeting their burden of proof. I think [the defendant] is innocent and I don't think the state . . . . In fact, I believe that . . . ."

is not the prosecutor's conduct alone [however] that guides our inquiry, but, rather, the fairness of the trial as a whole." (Internal quotation marks omitted.) *State* v. *Coney*, supra, 266 Conn. 807.

"[I]n determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. . . . Included among those factors are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Thompson*, supra, 266 Conn. 478. We will address each of these issues in turn.

## A

### Whether the Misconduct Was Invited

We conclude that the challenged statements of the prosecutor were invited by the defense. During his closing, defense counsel made the following remarks: "But, if there was some sort of ruckus going on in the bedroom when the kids were sleeping in the other room, I think the kids would wake up in the middle of the night. Common sense dictates that they would have woken up if there was a real problem going on there. It makes more sense that the extramarital affair continued on that evening. . . . And that [A and B] have to stay here and save their reputations in the community . . . ." This was an inference favoring the defendant based on A's failure to scream. Therefore, it invited the prosecutor to address the comments and offer an alternative explanation for the evidence. He did so with the challenged remarks, "a large portion of this trial I was kind of burnt out . . . having a hard time focusing.

. . . I probably should have asked her why she didn't scream," which served as a reminder to the jury that defense counsel's argument was merely an inference because A had never actually been questioned about her failure to scream. The prosecutor then proceeded to offer an alternative, equally valid inference—that A's failure to act was motivated by a fear for her children's safety.

B

### Whether the Prosecutorial Misconduct Was Frequent and Severe

The misconduct in this matter was not frequent because it was limited to an isolated[9] series of remarks made during closing arguments. Although even "a single instance of improper argument, properly preserved for . . . review, [can be] sufficient to warrant a reversal [of conviction]," the degree of misconduct in this case does not rise to this level.

Nor was the misconduct severe. First, it is very possible that the prosecutor's remarks regarding his negligence in questioning reflected negatively upon the state in the minds of the jurors by giving the impression of ill preparedness, and perhaps even incompetence. Second, we consider it significant that while defense

[9] In his brief, the defendant suggests that the court should consider nonpreserved claims for the narrow purpose of determining frequency, but not misconduct as a whole. We decline to do so pursuant to Practice Book § 60-5, which indicates that the court on appeal is not bound to consider any claims that were not distinctly raised at trial. To do otherwise could prejudice unfairly the state on appeal because there has been no legal determination as to whether the challenged comments actually constituted misconduct.

Additionally, we disagree with the defendant's claim that the Appellate Court concluded that certain nonpreserved allegations of misconduct showed "a pattern of improper comments throughout the trial." The Appellate Court simply remarked that "the improper remarks . . . were not isolated occurrences." State v. Sinvil, supra, 76 Conn. App. 773 n.7. To conclude therefrom that misconduct tainted the whole of the trial is an exaggerated reading of this remark.

counsel objected to the inappropriate remarks at trial, he failed to request curative instructions or move for a mistrial. Presumably, defense counsel may "not [have] view[ed] the . . . impropriety as prejudicial enough to seriously jeopardize the defendant's right to a fair trial." (Internal quotation marks omitted.) *State* v. *Thompson*, supra, 266 Conn. 479. Finally, the prosecutor's remarks never insinuated that the jury should do anything other than decide the case based on all of the facts presented.

C

Whether the Misconduct Was Central to the Critical Issues in the Case and Whether Sufficient Curative Instructions Were Given

Next, the misconduct in this matter was unrelated to the central issue at trial, namely, the credibility of A and the defendant, who offered competing testimony at trial about the alleged assault. As in *State* v. *Ceballos*, supra, 266 Conn. 416, this matter is characterized by a lack of physical evidence and conflicting testimony, making it a "credibility contest" of sorts between A and the defendant. Unlike in *Ceballos*, however, we are not persuaded that the prosecutor's statements were designed to bolster or denigrate the credibility of either party.

In *Ceballos*, the prosecutor improperly questioned the defendant directly about the veracity of the victim and made the following comments about him to the jury: "I would submit that the defendant is not concerned about what God is going to do to him, not now anyways. He's worried about what you people are going to do, and that's why he had to say what he said yesterday." (Internal quotation marks omitted.) Id., 382. By these remarks, the prosecutor implied that the defendant had lied, which directly implicated the credibility of the victim. Id.

By contrast, in the present case, the prosecutor remarked that "a large portion of this trial I was kind of burnt out on what was going on. I was having a hard time focusing. . . . I probably should have asked her why she didn't scream. . . . There was no testimony from her or from the defendant . . . ." This statement did not implicate the veracity of A or the defendant. It simply drew attention to the fundamental lack of evidence regarding why A did not call out. We cannot conclude, based on the facts of the record, that the prosecutor's comments in this matter improperly bolstered A's credibility, as they had in *Ceballos*.

Likewise, we believe that the trial court's general jury instructions went a long way toward curing any harm resulting from the prosecutor's misconduct. In its final charge, the trial court stated to the jury: "[I]t's 100 percent your duty to decide the facts in this case. You should not be influenced by whether you like me, the lawyers, or anybody." Also the trial court gave lengthy, detailed instructions about the central issue in the case, which was credibility.[10] "[I]n the absence of an indication to the contrary, the jury is presumed to have followed [the trial court's] curative instructions." (Internal

---

[10] We do not find it necessary to transcribe the trial court's entire jury charge here. The following is a representative excerpt: "[T]his is a case of credibility. In deciding what the facts are, you must consider all the evidence. In doing this, you must consider which testimony to believe and which testimony not to believe. You may believe all, none, or any part of a witness' testimony. In making that decision, you may take into account a number of factors, including the following. . . . (1) Was the witness able to see or hear or know things about which the witness testified? (2) How well was the witness able to recall and describe those things? (3) What was the witness' manner while testifying? (4) Did the witness have an interest in the outcome of this case or any bias or prejudice concerning any party or any matter involved in the case? (5) How reasonable was the witness' testimony in considering in light of all the testimony in the case? (6) Was the witness' testimony contradicted by what the witness has said or done at another time or by the testimony of other witnesses or other evidence?"

quotation marks omitted.) *State* v. *Ceballos*, supra, 266 Conn. 413. Furthermore, we note that the defendant never requested any specific instructions from the trial judge. Accordingly, we conclude that the instructions were sufficiently thorough to mitigate any prejudice that the prosecutor's closing remarks may have caused.

### D

### Whether the Strength of the State's Case Outweighed the Prejudice of the Misconduct

Finally, we conclude that the state's case against the defendant was sufficiently strong to sustain a conviction notwithstanding the improper statements from the prosecutor. There was ample trial testimony, both from A and the defendant, from which the jury could have made reasonable credibility determinations. Furthermore, while the lack of evidence may have increased the significance of the prosecutor's misconduct, we find the defendant's contention that it had a "direct impact" on the "otherwise tenuous" outcome unpersuasive, particularly in light of the fact that the jury rendered its verdict within twenty minutes of beginning deliberations.

On the basis of these six factors, we conclude that the prosecutor's misconduct did not deprive the defendant of his due process right to a fair trial.

### II

### SUPERVISORY AUTHORITY

As an alternative ground for affirming the Appellate Court's decision, the defendant claims that we should invoke our supervisory authority to uphold the judgment reversing his conviction.[11] Specifically, the defendant requests that we exercise our supervisory powers to balance the interests of the parties in light of "the extent of

---

[11] Practice Book § 84-11 requires a party raising such alternative grounds to file paperwork for special permission before filing the brief. Section 84-11 (a) provides in relevant part: "If such alternative grounds for affirmation or adverse rulings or decisions to be considered in the event of a new trial were not raised in the appellate court, the party seeking to raise them in the supreme court must move for special permission to do so prior to the filing of that

prejudice endured [by the defendant] as a result of the [prosecutor's] damaging improper comments during the rebuttal portion of closing argument . . . ." We decline to do so in this case. It is true that "[e]ven when prosecutorial misconduct is not so egregious as to implicate the defendant's [due process] right to a fair trial, an appellate court may invoke its supervisory authority [over the administration of justice] to reverse a criminal conviction when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper. . . . Such a sanction generally is appropriate, however, only when the [prosecutor's] conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal." (Internal quotation marks omitted.) *State* v. *Thompson,* supra, 266 Conn. 485. In concluding that the prosecutor's misconduct in this matter was not patently "offensive to the sound administration of justice"; (internal quotation marks omitted) id.; we decline to exercise supervisory authority to affirm the judgment of the Appellate Court.

The judgment of the Appellate Court is reversed with respect to the claim of prosecutorial misconduct and the case is remanded to that court for consideration of the defendant's remaining claims on appeal.[12]

In this opinion VERTEFEUILLE and ZARELLA, Js., concurred.

party's brief. Such permission will be granted only in exceptional cases where the interests of justice so require." Although the defendant failed to do so, "we have refused to consider an issue not contained in a preliminary statement of issues only in cases in which the opposing party would be prejudiced by consideration of the issue." (Internal quotation marks omitted.) *State* v. *Cruz,* 269 Conn. 97, 99 n.2, 848 A.2d 445 (2004). Since the state did not contest this issue as prejudicial in a reply brief, we do not find it inappropriate to consider the defendant's alternative ground here.

[12] The defendant raised three claims in the Appellate Court. In addition to the claim of prosecutorial misconduct, the defendant claimed that his right to a fair trial was violated by the failure of a court interpreter to interpret testimony completely for the jury and by certain juror misconduct. Although the Appellate Court reversed the judgment of the trial court and ordered a new trial on the claim of prosecutorial misconduct, the Appellate Court declined to address the other two claims raised by the defendant, stating that the issues were not likely to recur at the new trial. *State* v. *Sinvil,* supra, 76 Conn. App. 763 n.1.

PALMER, J., concurring. I agree with the conclusion of the majority and with most of its reasoning. I concur separately only because I disagree with that portion of the majority's opinion in which the majority concludes that the improper remarks of the state's attorney were invited by defense counsel's comments during closing arguments. As the Appellate Court observed, "[t]he prosecutor's [improper] remarks that he was 'burnt out' during the trial and 'having a hard time focusing' were made in response to defense counsel's argument that 'if there was some sort of ruckus going on in the bedroom when the kids were sleeping in the other room, I think the kids would wake up in the middle of the night.' In essence, defense counsel was arguing that the fact that [the victim] did not scream upon finding the defendant in her bed with her supported an inference that the encounter was consensual. . . . [Defense counsel thus] was arguing one possible permissible inference *from the evidence*. This was proper argument and . . . it did not invite a response in rebuttal which referred to irrelevant matters *not in evidence*." (Emphasis in original.) *State* v. *Sinvil*, 76 Conn. App. 761, 771–72, 821 A.2d 813 (2003). Although defense counsel's comments *did* invite the state's attorney's *proper* rebuttal argument that there had been no screaming or, alternatively, that the victim's children might not have heard any such screaming because they frequently slept with the television on, defense counsel's comments cannot fairly be characterized as inviting the state's attorney's *improper* rebuttal argument that, during trial, he was "burnt out," "having a hard time focusing," and that he "should have asked [the victim] why she didn't scream."

In my view, even though the improper comments of the state's attorney about his physical condition and his failure to ask the victim why she did not scream were not invited, I nevertheless do not believe that, under all the circumstances, those comments rise to

the level of a due process violation. I therefore agree with the conclusion of the majority that, contrary to the determination of the Appellate Court, the improper remarks of the state's attorney do not warrant a new trial. Accordingly, I concur in the judgment.

SULLIVAN, C. J., dissenting. I respectfully dissent from the majority opinion because I agree with the Appellate Court's conclusion that the defendant was deprived of his due process right to a fair trial, as protected by the federal constitution, as a result of the prosecutor's improper "attempt to affect the jury's decision by arguing facts not in evidence, namely, his own physical condition or the questions that he should have asked [and did not]." *State* v. *Sinvil*, 76 Conn. App. 761, 771, 821 A.2d 813 (2003).