STATE OF CONNECTICUT *v.* ANEUDI NIEVES
(AC 24556)

Schaller, Flynn and DiPentima, Js.

Argued January 21—officially released June 7, 2005

*Alice Osedach*, assistant public defender, with whom, on the brief, was *E. Paul Haringa*, assistant public defender, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Thomas R. Garcia*, assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, J. The defendant, Aneudi Nieves, appeals from the judgments of conviction, following a jury trial, of two counts of robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (4) and 53a-8 (a) and one count of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (4) and 53a-48 (a).[1] On appeal, the defendant claims that the court violated his rights under the sixth amendment to the United States constitution[2] by (1) allowing a witness to invoke his fifth amendment right not to testify through the representation of counsel without conducting a hearing and requiring the witness to take the stand and (2) enhancing the defendant's sentence, pursuant to General Statutes § 53-202k, without proper notice and without sending the issue to the jury. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On February 1, 2002, Sam Desai, the owner of the Travelers Inn in East Hartford, received a telephone call from a very scared and nervous employee, Sahid

---

[1] The jury also found the defendant not guilty of one additional count of conspiracy to commit robbery in the first degree.

[2] The defendant also claims that the court violated his rights under article first, § 8, of the constitution of Connecticut. Because he provides no separate analysis of his state constitutional claim, we address only the federal constitutional claim. See *State* v. *Sinvil*, 270 Conn. 516, 518 n.1, 853 A.2d 105 (2004).

Sheikh. Sheikh reported to Desai that the motel had just been robbed by two men, one of whom brandished a gun. Sheikh was then forced into a bathroom and ordered to remain there. Desai told Sheikh to telephone the police, but Sheikh refused. Sheikh pleaded with Desai not to telephone the police himself. Desai relented and did not report the robbery at that time.

Also on February 1, 2002, two men entered a DB Mart in East Harford and, after requesting a pack of cigarettes and handing the clerk, Shiv Man Shrestha, some money, one of them jumped over the counter when Shrestha opened the cash register. The other man brandished a gun. The men took approximately $400 from the register before fleeing. The DB Mart was equipped with a security camera, which filmed the robbery.

On February 6, 2002, the defendant and Keith Warren were apprehended by members of the Southington police department on unrelated charges. After being interviewed by members of the East Hartford police department, the defendant and Warren both admitted to committing robberies at the Travelers Inn and the DB Mart, and they each signed confessions. Because there had been no report of a robbery at the Travelers Inn, Officer Cheryl Proctor went to the motel to investigate. Initially, Sheikh denied that anything unusual had happened on February 1, 2003,[3] but Proctor took a statement from Desai the next day concerning the robbery and Sheikh's frightened telephone call.

The defendant was charged with two counts of robbery in the first degree and two counts of conspiracy to commit robbery in the first degree. Following a jury trial, he was convicted of both counts of robbery in the first degree and of one count of conspiracy to commit robbery in the first degree. The court sentenced the

---

[3] Sheikh was unavailable at the time of trial, and his statements to Desai concerning the robbery were admitted into evidence as excited utterances.

defendant to concurrent ten year terms for the conspiracy charge and for one of the robbery charges. The court sentenced the defendant to a consecutive term of ten years for the other robbery. The court, pursuant to § 53-202k, also enhanced the defendant's sentence for each robbery by five years, to run concurrent with each other but to run consecutive to the other sentences, giving the defendant a total effective sentence of twenty-five years incarceration. This appeal followed.

I

On appeal, the defendant first claims that the court violated his right to present a defense under the sixth amendment to the United States constitution by allowing a witness, Ahmat Ojeda, to invoke his fifth amendment right not to testify through the representation of counsel without requiring Ojeda to take the stand and personally to invoke his privilege against self-incrimination at a hearing. The state argues, in part, that the defendant is not entitled to review of this claim because it is unpreserved and it is not truly of constitutional magnitude alleging the violation of a fundamental right. In the alternative, the state argues that, even if the claim is of constitutional magnitude, a violation that would have denied the defendant a fair trial does not clearly exist.

The defendant contends that his claim is preserved because, although he did not specifically request that the court hold a hearing and require the witness personally to invoke his privilege, he sought to compel the witness to testify. In the alternative, the defendant requests that we review this claim pursuant to the analysis set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). In order to obtain relief under *Golding*, however, the defendant's claim must be of constitutional magnitude, alleging the violation of a fundamental right, and the violation must clearly exist and

clearly deprive the defendant of a fair trial. See id. After reviewing the record and the briefs, we agree with the state that the claim was not preserved and that a constitutional violation, which deprived the defendant of a fair trial, does not clearly exist.

Before and during trial, the defendant sought to challenge his written confession, which was written in English. Initially, he filed a motion to suppress any oral and written statements on the grounds that he was arrested without probable cause and that the statements were taken in violation of his federal and state constitutional rights.[4] The court denied that motion prior to the start of trial.[5] During trial, the defendant called witnesses who testified that he was not able to read or write English very well.[6] The defendant called Jessica Brunelle, his former girlfriend of seven years, to testify on his behalf. Brunelle testified that she often read letters to the defendant because "he didn't understand always what he was reading," and he had difficulty with the meaning of certain words. She also testified that the signature on the *Miranda* waiver form was that of the defendant, but she thought he would have had difficulty understanding the meaning of several words on the form, such as "advised," "remain" and "desire." After being shown the defendant's signed statement, Brunelle testified that much of the statement was "pretty simple" but that she thought the defendant would have had difficulty with some of the words. Brunelle also testified that the defendant "can read . . . but it doesn't make too much sense to him." Finally, Brunelle testified that the defendant had informed her that letters that he wrote to her from prison actually were written by his cell mate. The defendant also called

[4] During the suppression hearing, defense counsel conceded the issue of probable cause.

[5] The propriety of that ruling is not the subject of this appeal.

[6] The defendant did not testify at trial.

Warren and one of his former high school teachers to testify as to the defendant's difficulty reading and writing English.

The state offered testimony from Julie Gasiorek, a prison official, who testified that the defendant had signed the prison's telephone policies, listing the names and telephone numbers of those people with whom the defendant wanted to have contact, on the English side of the form. She also testified that prison officials had intercepted a letter written by the defendant in English.

The defendant then sought to call Ojeda, a former cell mate of the defendant, to the stand to testify that Ojeda had written letters in English on the defendant's behalf. More specifically, the defendant sought to have Ojeda testify that the defendant had dictated the intercepted letter to Ojeda, that Ojeda then wrote the letter in English and that the defendant merely had copied the letter into his own handwriting. Because Ojeda was awaiting trial on unrelated charges of assault and attempted murder, the court granted the defendant's motion for a continuance so that Ojeda's attorney could be contacted. When trial resumed a few days later, Attorney Mark Solak informed the court that Ojeda, his client, would invoke his fifth amendment privilege against self-incrimination as to all questions. Additionally, Solak stated that he wanted his client to invoke his right not to testify without taking the stand to claim the privilege because Ojeda was asserting a defense of diminished mental capacity as to his pending charges and that "any conduct of [Ojeda] in this courtroom, would be admissible by the state of Connecticut in Mr. Ojeda's case." The defendant did not request specifically that the court hold a hearing on this matter, requiring Ojeda personally to invoke his privilege, but, instead, he moved to compel Ojeda to testify, arguing that his testimony would not be self-incriminating. In the alternative, he urged the court to strike the inter-

cepted letter.[7] The court denied both motions. The defendant did not raise specifically before the court any objection to Solak's invocation of his client's privilege without requiring Ojeda personally to take the stand. Rather, he raised this issue for the first time in a postverdict motion to set aside the verdict. The issue, therefore, is unpreserved.

On appeal, the defendant does not claim that the court improperly ruled that Ojeda could exercise his fifth amendment privilege. Rather, the defendant claims that the court violated his sixth amendment right to present a defense simply by failing to hold a hearing, requiring Ojeda to take the stand and personally to invoke his fifth amendment privilege. The defendant argues that this case is similar to *State* v. *Cecarelli*, 32 Conn. App. 811, 631 A.2d 862 (1993), where we held

---

[7] In a postverdict motion, the defendant raised the issue of the court's failure to require that Ojeda personally assert his privilege. He did not contest, nor does he contest on appeal, the propriety of the court's conclusion that it could be harmful to Ojeda to take the stand. If we assume, without deciding, that this conclusion was correct, Ojeda's right to invoke his fifth amendment privilege would trump the defendant's sixth amendment right to present a defense. See *State* v. *Brown*, 22 Conn. App. 521, 525, 577 A.2d 1120 ("[w]hen . . . a defendant's sixth amendment right conflicts with a witness' fifth amendment privilege against self-incrimination, the witness' privilege must prevail"), cert. denied, 216 Conn. 825, 582 A.2d 204 (1990); *United States* v. *Carr*, 67 F.3d 171, 176 (8th Cir. 1995) ("defendant's Sixth Amendment right . . . does not include the right to compel a witness to waive his Fifth Amendment privilege"), cert. denied, 516 U.S. 1182, 116 S. Ct. 1285, 134 L. Ed. 2d 230 (1996); *United States* v. *Khan*, 728 F.2d 676, 678 (5th Cir. 1984) (when defendant's sixth amendment rights and witness' fifth amendment rights conflict, accused's right to compulsory process must give way to witness' fifth amendment privilege not to give testimony that would tend to incriminate him); *United States* v. *Gay*, 567 F.2d 916, 919 (9th Cir.) (sixth amendment right of accused to compulsory process to secure attendance of witness does not include right to compel witness to waive fifth amendment privilege), cert. denied, 435 U.S. 999, 98 S. Ct. 1655, 56 L. Ed. 2d 90 (1978); see also *United States* v. *Regan*, 232 U.S. 37, 50, 34 S. Ct. 213, 58 L. Ed. 494 (1914) ("guaranty in the Fifth Amendment . . . against compulsory self-incrimination . . . is of broader scope than are the guaranties in . . . the Sixth Amendment governing trials in criminal prosecutions").

that the defendant's right to present a defense was implicated because the court did not hold a hearing, as requested by the defendant, to determine whether a witness, Anthony Gentile, would invoke his fifth amendment right not to testify as to each and every question but, instead, relied on the representation of Gentile's attorney. Id., 818–19. We conclude, however, that *Cecarelli* is distinguishable from the present case.

In *Cecarelli*, the defendant claimed entrapment as a defense, and he testified that it was Gentile who assisted with this entrapment. Id. 813. To support his entrapment defense, the defendant attempted to call Gentile as a witness. Id., 817. Gentile's attorney informed the court, however, that Gentile would exercise his fifth amendment privilege not to testify. Id. The court accepted the attorney's representation and, despite the defendant's request, declined to conduct a hearing outside of the presence of the jury at which Gentile could be questioned personally as to whether he would invoke his privilege against self-incrimination as to each and every question. Id., 817–18. In that case, we concluded that the hearing was necessary because the defendant argued that, under the circumstances, Gentile's constitutional privilege might not pertain to all of the questions that the defendant sought to ask regarding his defense of entrapment. Id., 818–19. The defendant had claimed that he was denied the opportunity to inquire as to whether any charges were pending against Gentile at the time of the alleged entrapment, whether Gentile had been promised anything for his cooperation as an informant for two police departments, or what motivated him to approach the defendant. Id. 820. We concluded that the court's failure to hold the requested hearing implicated the defendant's constitutional right to present a defense. Id.

In this case, however, there is no claim that Ojeda might have answered some relevant questions that

would go to the defendant's defense, and, reviewing the defendant's brief, we can observe no analysis as to how the court's failure to hold a hearing implicated the defendant's right to present his defense. Accordingly, we reject the defendant's claim.

As explained by the United States Court of Appeals for the Ninth Circuit Court in *United States* v. *Klinger*, 128 F.3d 705 (9th Cir. 1997), a case in which a defendant also claimed that his sixth amendment right was violated by the exclusion of a witness' testimony and the court's refusal to conduct a hearing: "In deciding whether the testimony of a particular witness should be excluded because that witness will refuse to answer 'noncollateral' questions, a [court] must ordinarily determine whether a witness will invoke his Fifth Amendment privilege 'in response to specific questions.' . . . A [court] may conduct an evidentiary hearing of the proposed [witness'] testimony outside the presence of the jury, but our case law does not mandate such a hearing. . . . Where the [court] finds that the witness could invoke his Fifth Amendment privilege as to all questions, it may recognize a [witness'] blanket privilege against self-incrimination if 'the court, based on its knowledge of the case and of the testimony expected from the witness, can conclude that the witness could legitimately refuse to answer essentially all relevant questions.'" (Citations omitted.) Id., 709. In holding that this evidentiary issue was properly decided, the court explained: "Although the [court] did not hold an evidentiary hearing to determine whether [the witness] would invoke his Fifth Amendment privilege, the court did conduct a thorough colloquy on this issue with counsel for both sides. The [court] based its decision to exclude [the witness'] testimony on the attorneys' representations about the expected content of that testimony . . . . [T]he [court] appropriately excluded that testimony without an evidentiary hear-

ing." (Citation omitted; internal quotation marks omitted.) Id., 709–10; see also *United States* v. *Warfield*, 97 F.3d 1014, 1019–20 (8th Cir. 1996) (court's acceptance of counsel's statement that witness would invoke his privilege against self-incrimination, without requiring witness personally to invoke privilege, not improper), cert. denied sub nom. *Thomas* v. *United States*, 520 U.S. 1110, 117 S. Ct. 1119, 137 L. Ed. 2d 319 (1997); *United States* v. *Swanson*, 9 F.3d 1354, 1359 (8th Cir. 1993) (court's acceptance of witness' attorney proffer that witness would invoke fifth amendment privilege not improper); *United States* v. *Roberts*, 503 F.2d 598, 600 (9th Cir. 1974) (where counsel for former codefendant advised court that client would claim fifth amendment privilege, witness need not take stand personally to assert privilege), cert. denied, 419 U.S. 1113, 95 S. Ct. 791, 42 L. Ed. 2d 811 (1975); *People* v. *Macana*, 84 N.Y.2d 173, 178, 615 N.Y.S.2d 656, 639 N.E.2d 13 (1994) (although witness normally should be summoned specifically to invoke fifth amendment privilege, where undisputable inference is that testimony of witness would be incriminating and that witness would refuse to testify, court needs no further verification apart from counsel's representation).

Here, the court conducted a thorough colloquy with the attorneys and concluded that it was not only unnecessary, but agreed with Solak that it might be harmful to his defense, for Ojeda to take the stand given his proposed defense of diminished mental capacity. The defendant provides us with insufficient analysis as to how that conclusion implicated his right to present his defense, solely because it was made by the court without mandating that Ojeda personally invoke his privilege at a hearing. We cannot conclude, on the basis of the record and the briefs in this case, that the court's failure to hold such a hearing clearly implicated the

defendant's sixth amendment right to present a defense and that it clearly deprived him of a fair trial.

## II

The defendant next claims that the court violated his sixth amendment rights by enhancing his sentence, pursuant to § 53-202k, without proper notice and without sending the issue to the jury.[8] The state argues that under the facts of this case, any error was harmless beyond a reasonable doubt.

On April 28, 2003, prior to the commencement of jury selection, the state filed with the court a notice of intent in each file to seek a sentence enhancement pursuant to § 53-202k, which provides in relevant part: "Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm . . . shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony." Although the state provided the written notice of its intent to seek sentence enhancement on April 28, 2003, it did not include § 53-202k on the long form informations, which listed the charges against the defendant, and the court did not instruct the jury on this provision.

On July 22, 2003, the day that the defendant was being sentenced, the state again notified the court that it would be seeking to enhance the defendant's sentence for the robberies on the basis of § 53-202k. The defendant objected on the ground that the issue should have been presented to the jury for its consideration, and the state argued that this omission was harmless error.

---

[8] The defendant did not raise the issue of insufficient notice before the trial court and asks for review of that portion of his claim under the standards articulated in State v. Golding, supra, 213 Conn. 239–40.

The court overruled the defendant's objection, concluding that the jury necessarily found that the defendant or his accomplice had used or threatened to use a firearm while committing the robberies, and it sentenced the defendant to the enhanced penalty of five years.

A

Relying on *State* v. *Velasco*, 253 Conn. 210, 226, 751 A.2d 800 (2000), the defendant argues that "it was never the legislature's intent with regard to § 53-202k to eliminate the jury's role as fact finder." Here, the defendant argues, the state "did just that." Recognizing that case law subsequent to *Velasco* has held this omission to be harmless error, the defendant further argues: "[T]his court has continually 'lowered the bar' in allowing prosecutors to virtually ignore this necessary function of the jury with regard to this sentencing enhancement. In so doing, this court has 'institutionalized' harmless error. In this particular case, both the state and the trial court recognized what they had done constituted error yet chose to proceed anyway. This court should either remove the 'fig leaf' and allow the state to simply ignore the jury from the outset or rein them by saying in this case they have gone too far."

In *Velasco*, our Supreme Court held that § 53-202k requires the jury, and not the trial court, to determine whether a defendant used a firearm in the commission of a class A, B or C felony for purposes of the sentence enhancement. Id., 218. We are constrained by *Velasco's* holding that the trial court's failure to allow the jury to make such factual determinations is amenable to harmless error analysis. Id., 232–33. In *Velasco*, the court held that it was not harmless error for the court to fail to submit instructions regarding the elements of sentencing enhancement under § 53-202k to the jury because, in that case, "a finding of guilt on [the underly-

ing] counts was not contingent on the defendant's use of a firearm." Id., 231.

Here, the charges of robbery in the first degree in violation of §§ 53a-134 (a) (4) and 53a-8 (a) specifically required the state to prove, and the jury to find, that the defendant, or another participant acting with the aid of the defendant, in the course of the commission of the crime of robbery displayed or threatened the use of what he or the other participant represented by words or by conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm. An affirmative defense to a violation of § 53a-134 (a) (4) is that "such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged." General Statutes § 53a-134 (a) (4).

The record reveals that in reporting the February 1, 2002 robbery of the Travelers Inn to Desai, Sheikh stated that one of the robbers brandished a gun. Shrestha also testified that one of the men that robbed the DB Mart had brandished a gun. The security camera at the DB Mart also filmed the robbery and showed a gun being used in the commission of that robbery; this video was shown to the jury. The defendant alludes to the fact that Warren testified that the weapon brandished during the robberies was an inoperable BB gun and thus not capable of being fired. The statutory alternative, under which the defendant was charged, however, does not require that what the defendant represents to be a firearm actually is a firearm, much less an operable one. The charging documents in this case specifically stated, in relation to the charge of robbery in the first degree in violation of §§ 53a-134 (a) (4) and 53a-8 (a), that "in the course of committing the crime of robbery, [the defendant or another participant] displayed and threatened the use of what he or another participant *represented* by their words and conduct to be a pistol, revolver or other firearm." (Emphasis added.) As we

explained in *State* v. *Tinsley*, 47 Conn. App. 716, 721–22, 706 A.2d 1008, cert. denied, 244 Conn. 915–16, 713 A.2d 833 (1998), "a guilty verdict under § 53a-134 (a) (4) does not require proof of operability [of the gun]. A conviction can result whether [or not] the defendant possessed a gun. All that is required is that the defendant [or his accomplice] displays or threatens the use of what he represents by his words or conduct to be a [gun]. . . . To conclude otherwise would render this statutory provision inapplicable in situations where weapons cannot be recovered or where a defendant represents to have a gun but, in fact, does not. Certainly, the legislature did not intend to omit those frequently occurring scenarios from sentence enhancement." (Citation omitted; internal quotation marks omitted.)

Here, the jury found the defendant guilty of two counts of robbery in the first degree. Clearly then, the jury found that the defendant or Warren, with the aid of the defendant, displayed or threatened the use of a purported firearm during the course of two robberies. See General Statutes § 53a-134 (a) (4); see also General Statutes § 53a-134 (b) (classifying first degree robbery as class B felony). With those findings of guilt, the jury necessarily concluded that the defendant or Warren, with the aid of the defendant, committed each element of § 53-202k in that at least one of them, while committing robbery in the first degree was "armed with and threaten[ed] the use of, or display[ed], or represent[ed] by his words or conduct that he possess[ed] [a] firearm . . . ." General Statutes § 53-202k. Accordingly, we conclude that the jury, in finding the defendant guilty of the class B felony of robbery in the first degree, necessarily found that the defendant or his accomplice in the commission of the crimes used or threatened the use of a firearm. We, therefore, reject the defendant's argument that he was deprived of, what was represented as, his right to have the jury make the factual finding that

the predicate use of a purported firearm, necessary for sentence enhancement, had occurred in the commission of the robberies.

B

The defendant argues that his constitutional right to notice of the charges levied against him was violated when the state failed to include a violation of § 53-202k on the long form informations. Specifically, the defendant argues that "the court committed error when it sentenced the defendant under a statutory provision that was not contained in the information which was submitted to the jury. . . . [T]he charging document did not place the defendant on notice of this particular criminal charge."[9] The defendant does not explain, except as it relates to the court's failure to submit the issue to the jury, which we discussed in part II A, how he was harmed by the state's omission of § 53-202k from the long form informations, in light of the fact that the state filed a written notice of intent on April 28, 2003. In so far as the defendant did not object on the ground of inadequate notice to the court's deciding the applicability of § 53-202k, he seeks review under the doctrine set forth in *State* v. *Golding*, supra, 213 Conn. 239–40. We conclude that that the defendant was notified of the state's intention to seek sentence enhancement pursuant to § 53-202k on or about April 28, 2003, and we are not persuaded that a clear constitutional violation exists which clearly deprived the defendant of a fair trial. In *State* v. *Boulier*, 81 Conn. App. 824, 830–31, 841 A.2d 1217, cert. denied, 269 Conn. 909, 852 A.2d 740, cert. denied, 543 U.S. 966, 125 S. Ct. 422, 160 L. Ed. 2d 334 (2004), the defendant alleged a violation of his sixth amendment right to be informed of the

[9] We note that § 53-202k does not create a separate offense but, rather, is a sentence enhancement. *State* v. *Dash*, 242 Conn. 143, 148, 698 A.2d 297 (1997).

accusations against him because he was not informed until the first day of jury selection that the state was seeking a sentence enhancement under § 53-202k.[10] In holding that the defendant was informed adequately of the charges against him, we explained that "[b]ecause the defendant was aware of the robbery charge, he was able to prepare intelligently to defend himself on each of the essential elements of both that charge and the potential sentence enhancement. As such, the defendant was not faced with any prejudicial surprise by not being informed of the state's intent to seek a sentence enhancement until the first day of jury selection." Id., 831–32.

Here, although the state did not append the alleged violation of § 53-202k to the long form informations, it filed a notice of intent to seek sentence enhancement with the court on April 28, 2003, with an attestation that a copy was delivered to defense counsel that same day. Counsel does not claim that a copy was not received. The defendant was aware of the charges of robbery in the first degree and, therefore, was able to prepare for trial on each of the essential elements of the robbery charges and the sentence enhancement. See id. We conclude, therefore, that the defendant had received notice that the state would be seeking a sentence enhancement. Lacking further analysis from the defendant, we cannot conclude that a clear constitutional violation exists in this case that deprived the defendant of a fair trial.

---

[10] It is not clear in *Boulier*, whether the state filed an amended information or a notice of intent to seek sentence enhancement. See *State* v. *Boulier*, supra, 81 Conn. App. 827; see also *State* v. *Roman*, 67 Conn. App. 194, 207, 786 A.2d 1147 (2001) ("[o]n March 11, 1998, the state filed a notice of sentence enhancement under § 53-202k"). The defendant's brief provides no analysis on the effect of simply filing a notice of intent except as it relates to the issue not being submitted to the jury. We assume, without deciding, however, that the absence of a reference to § 53-202k in the information would not *necessarily* prohibit the court from submitting the issue to the jury.