# STATE OF CONNECTICUT *v.* ROBERT A. LEGNANI
## (AC 26840)

DiPentima, McLachlan and West, Js.

Argued February 5—officially released July 29, 2008

*Moira L. Buckley,* for the appellant (defendant).

*James A. Killen,* senior assistant state's attorney, with whom, on the brief, were *Scott J. Murphy,* state's attorney, and *Kevin Murphy,* senior assistant state's attorney, for the appellee (state).

*Opinion*

WEST, J. The defendant, Robert A. Legnani, appeals from the judgments of conviction, rendered after a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (1), three counts of criminal possession of a pistol in violation of General Statutes § 53a-217c (a) (1), criminal use of a firearm in violation of General Statutes § 53a-216, possession of a weapon in a motor vehicle in violation of General Statutes § 29-38 and possession of marijuana in violation of General Statutes § 21a-279 (c).[1] On appeal, the defendant claims that (1) the state presented insufficient evidence to support the counts of criminal possession of a pistol, criminal use of a firearm and possession of a weapon in a motor vehicle, (2) the trial court improperly concluded that the verdict in docket number CR04-0022869-T was not tainted by juror misconduct, after conducting an insufficient inquiry, (3) the court improperly denied his motion to suppress certain identification testimony, (4)

[1] There were two informations involved in this case. In docket number CR04-0022869-T, the defendant was acquitted of attempt to commit murder but convicted of assault in the first degree, criminal possession of a pistol, criminal use of a firearm and illegal possession of a weapon in a motor vehicle. In docket number CR04-0023326-T, the defendant was convicted of two counts of criminal possession of a pistol and possession of marijuana. Pursuant to the state's motion, the two informations were consolidated for trial.

the court improperly failed to hold a *Porter*[2] hearing and (5) the court improperly consolidated the two informations for trial. We affirm the judgments of the trial court.

The jury reasonably could have found the following facts. On the night of May 1, 2004, the victim, Jerry Sweeney, attended a party in Southington with his friend, Trevon Scott. Scott had been invited to the party, which was a birthday party for Chris Dellaventura, Tom Folak and Christine Casertano, and he invited Sweeney. The defendant also attended the Southington party that evening.

Sweeney's antisocial behavior, after drinking continuously during the course of the evening, incited a group of male partygoers to chase both him and Scott from the party premises. Casertano, who was returning to the party after having accompanied the defendant to his home, observed Sweeney and Scott fleeing from the angry crowd. She and some friends drove to their aid, picked them up and brought them to her home. Once at Casertano's house, Sweeney continued to drink and became more obnoxious and belligerent. The defendant was not at Casertano's house while this was occurring. When Sweeney started to become belligerent and uncontrollable, Casertano called the defendant to ask if he would drive Sweeney home. The defendant agreed to do so. Casertano, upset with Sweeney because of his previous behavior at the party and his present behavior at her house, asked him to leave. On his way out of the house, Sweeney threw his vodka drink in her face. He then began yelling obscenities and calling her various insulting names while standing on her front lawn. He also threatened to have the Diablos, a motorcycle gang, "do things" to her.

---

[2] *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998).

A few minutes after Sweeney had thrown his drink in her face, Casertano received a telephone call from the defendant. She informed him of Sweeney's recent behavior, and he asked to be provided with the direction in which Sweeney was headed. Although unable to provide the requested information, while still on the telephone, she saw the defendant in his van drive by her house.

After leaving Casertano's house, and while wandering the streets on foot in an attempt to find a way home from the unfamiliar neighborhood, Sweeney noticed a van behind him proceeding very slowly. Soon thereafter, he noticed that the van was no longer behind him but, instead, was approaching him from the front. Sweeney then jumped into the bushes to hide for a short period of time before continuing on. Soon after he began to walk again, he noticed the same van, which stopped in front of him. The driver shouted to Sweeney, asking him if he knew "Chrissy," to which Sweeney responded that he did know her. Then the driver pointed what appeared to be a cap gun at Sweeney, who then heard a "click" and a loud noise and immediately felt pain in his stomach. Subsequently, police officers responded to the scene where they found Sweeney lying in the road bleeding from a gunshot wound to the stomach. They quickly got him into an ambulance, which transported him to a hospital.

Meanwhile, after returning to his house, the defendant placed another call to Casertano to inform her that everything was taken care of and not to call him anymore that night. Subsequently, Casertano did call the defendant, expressing concern about Sweeney's returning to carry out his threats regarding the motorcycle gang. The defendant offered to stay with Casertano for the night, but she told him that it was not necessary, as Scott was going to stay over.

During the police investigation, Officer Lewis Palmieri spoke with Sweeney while he was still in the hospital. Sweeney told the officer that the person who shot him was a white male who was driving a gray van. Sweeney further described the van as being customized with tinted windows and a brow, a piece of plastic that extends over the windshield to prevent glare from the sun. After speaking with Sweeney, police officers drove past the defendant's house because his name had come up in their conversation with Casertano. After seeing a gray van, which matched the description given by Sweeney, in the defendant's driveway, the police officers put together an array of photographs, which included the defendant and eight other white males. When the detectives showed the array to Sweeney, he identified the defendant as the man who had shot him.

Shortly thereafter, detectives executed a search warrant on the defendant's home and seized several items: a Makarov pistol, a Colt .45 caliber pistol, a .30/.30 rifle, an SKS rifle, a twelve gauge shotgun, a Makarov pistol magazine, nine millimeter Makarov cartridges and less than four ounces of marijuana. The defendant was arrested, tried and convicted of the several crimes, as previously indicated. On August 10, 2005, the defendant was sentenced to a total effective term of twenty-five years incarceration, suspended after twelve years, with five years probation. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the state presented insufficient evidence to support his conviction of the charges of criminal possession of a pistol, criminal use of a firearm and possession of a weapon in a motor vehicle. Specifically, he argues that the state presented insufficient evidence of the barrel length of the firearm used to shoot the victim.

Our standard of review for a sufficiency of evidence claim is well established. "In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trier of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Farnum*, 275 Conn. 26, 32, 878 A.2d 1095 (2005).

The defendant argues that for the jury to find him guilty of criminal possession of a pistol, criminal use of a firearm and possession of a weapon in a motor vehicle, it had to find that the state had proved beyond a reasonable doubt that he had possessed or had used a pistol or a revolver. Citing General Statutes § 29-27, the defendant points out that a pistol and a revolver are both defined as firearms with a barrel length of less than twelve inches. The defendant also notes that the firearm used to shoot Sweeney never was recovered and that Sweeney was unable to describe the firearm in great detail. Therefore, the defendant argues, the state failed to prove that the weapon used was a pistol, as defined by the statute, and hence, failed to prove an essential element of the crimes. We do not agree with the defendant.

"Direct numerical evidence is not required to establish the length of the barrel of a handgun in question." *State* v. *Miles*, 97 Conn. App. 236, 242, 903 A.2d 675 (2006). In *State* v. *Williams*, 231 Conn. 235, 645 A.2d 999 (1994), overruled in part on other grounds by *State* v. *Murray*, 254 Conn. 472, 487, 757 A.2d 578 (2000) (en banc), our Supreme Court concluded that the state had presented sufficient evidence of the barrel length when several witnesses had stated that the defendant had pulled a "small handgun" out of his "waist length

jacket." (Internal quotation marks omitted.) Id., 252. Furthermore, in *State* v. *Miles*, supra, 242, this court concluded that the state had presented sufficient evidence of the length of the barrel because the victim had testified that he had seen the defendant with a handgun and had further described it as a silver handgun.

In the present case, we conclude that the jury reasonably could have found, on the basis of the evidence introduced at trial, that the firearm used to shoot Sweeney had a barrel length of less than twelve inches. At trial, Sweeney testified that the object pointed at him by the defendant was a gun, although he initially thought it might have been a cap gun. The state presented evidence that the defendant, at one point, had owned another Makarov pistol, in addition to the one recovered from his home. Evidence was also presented that the bullet casings found at the scene of the shooting had not been fired from the Makarov pistol seized from the defendant's home but had been fired from another Makarov pistol. Sweeney's description of the firearm as looking like a cap gun was similar to the witnesses' testimony in *Williams*, in which they described the defendant's gun as a "small handgun." As the court noted in *Williams*, "it is extremely unlikely that anyone would describe as 'small' a handgun that had a barrel of one foot or longer." *State* v. *Williams*, supra, 231 Conn. 252. Similarly, in the present case, it is unlikely that anyone would describe as a "cap gun" a firearm with a barrel length longer than one foot. Additionally, there was evidence that the defendant possessed nine millimeter Makarov ammunition, which was similar to the nine millimeter Makarov casings found at the scene, that the defendant had owned another Makarov pistol and that the bullet casings found at the scene had been fired by another Makarov pistol. It was, therefore, reasonable for the jury to infer from all of this evidence

that the missing Makarov pistol was the "cap gun" the victim described as having been used by the defendant in this shooting. As a result, we conclude that the state presented sufficient evidence of the barrel length of the firearm used to shoot Sweeney.

II

Second, the defendant claims that the court, after conducting an insufficient inquiry, improperly concluded that the verdict in CR04-0022869-T was not tainted by juror misconduct.

The following facts and procedural history are relevant to our disposition of the defendant's claim. On August 23, 2006, after sentencing had taken place, the defendant's appellate counsel filed with the trial court a postsentencing motion for an evidentiary hearing regarding potential juror misconduct. To support his motion, the defendant attached an affidavit of a juror, T,[3] in which the affiant stated: (1) T and at least one other juror initially voted "not guilty" on the attempt to commit murder charge, (2) all of the jurors eventually agreed to find the defendant not guilty of the attempt to commit murder charge, (3) T did not believe that the state had proven the defendant guilty of the assault charge, (4) T agreed to vote "guilty" on that charge only after another juror threatened to change his vote on the attempt to commit murder charge to guilty and (5) T changed his vote because he did not want a hung jury on the attempt to commit murder charge, thereby exposing the defendant to another trial for that more serious offense. On January 19, 2007, the court held an evidentiary hearing on the defendant's motion alleging jury misconduct. The court allowed the state and the defendant to submit potential questions for T with the caveat that the court would decide what questions

---

[3] To protect the privacy of the juror, we refer to him by initial. See *State v. Newsome*, 238 Conn. 588, 624 n.12, 682 A.2d 972 (1996).

would be asked and would conduct the inquiry. On that same date, the court conducted a limited inquiry of T, which mainly focused on T's recollection and awareness of the instructions on legal principles that had been given to the jurors prior to their deliberations. The court asked T questions such as, "Do you recall that I spent a fairly lengthy period of time giving the jurors instructions as to how they were to deliberate the case once it was turned over to them?" and, "[D]o you recall that I instructed the jury that the jurors must listen to the opinions of the other jurors in making deliberations, but . . . at the end, you make up your own mind?"

On March 2, 2007, the court issued a memorandum of decision denying the defendant's jury misconduct claim. The court held: "Connecticut courts have consistently found that the expressions and arguments of jurors in their deliberations and evidence as to their own motives, beliefs, mistakes and mental operations in arriving at a verdict are to be considered immaterial in claims of juror misconduct. To do otherwise would violate the sanctity of the juror process. This court feels that this process was concisely measured by the Connecticut Supreme Court in *Aillon* v. *State*, 168 Conn. 541, 550, 363 A.2d 49 (1975), when it held: 'That rule has been aptly described as applying the parol evidence rule to a jury's verdict, so that their outward verdict as finally and formally made, and not their prior and private intentions, is taken as exclusively constituting the act.'" The court, therefore, found there was no jury misconduct.[4]

---

[4] Prior to oral arguments in this court, the defendant had not filed an amended appeal challenging the court's denial of his postjudgment motion alleging juror misconduct, as is required by Practice Book § 61-9. Section 61-9 provides in relevant part: "Should the trial court, subsequent to the filing of the appeal, make a decision which the appellant desires to have reviewed, the appellant shall file an amended appeal form in the trial court within twenty days from the issuance of notice of the decision provided for in Section 63-1. . . ."

"Any assessment of the form and scope of the inquiry that a trial court must undertake when it is presented with allegations [or the possibility] of jury [bias or] misconduct will necessarily be fact specific. . . . We [therefore] have limited our role, on appeal, to a consideration of whether the trial court's review of alleged [or possible] jury misconduct can fairly be characterized as an abuse of its discretion. . . . Although we recognize that trial [c]ourts face a delicate and complex task whenever they undertake to investigate [the possibility] of juror misconduct or bias . . . we nevertheless have reserved the right to find an abuse of discretion in the highly unusual case in which such an abuse has occurred. . . . Ultimately, however, [t]o succeed on a claim of [juror] bias the defendant must raise his contention of bias from the realm of speculation to the realm of fact. . . .

"[W]hen . . . the trial court is in no way responsible for the [possible] juror misconduct [or bias], the defendant bears the burden of proving that the misconduct [or bias] actually occurred and resulted in actual prejudice." (Citation omitted; internal quotation marks omitted.) *State* v. *Sinvil*, 90 Conn. App. 226, 240–41, 876 A.2d 1237, cert. denied, 275 Conn. 924, 883 A.2d 1251 (2005).

In the present case, the defendant argues that the court did not conduct a sufficient examination of T to ascertain whether juror misconduct occurred. The

One day after oral argument, on February 6, 2008, this court issued an order for supplemental briefs, requiring the parties to address whether the juror misconduct claim was reviewable in light of the defendant's failure to file an amended appeal from the court's denial of his postjudgment motion alleging juror misconduct. On February 7, 2008, the defendant filed a motion for leave to file an amended appeal out of time, to which the state did not object and which this court granted. Consequently, the order for supplemental briefs was vacated. The defendant then filed the amended appeal form on February 21, 2008. Therefore, because the defendant has now complied with our rules of practice, this juror misconduct claim is reviewable by this court.

defendant notes that the court did not ask the juror if he recalled the court's instruction prohibiting consideration of punishment or the consequences of their verdict. We do not find the defendant's arguments persuasive.

The defendant, in essence, wanted the court to inquire more deeply into the alleged juror misconduct. The court basically asked T whether he recalled the relevant instructions given by the court prior to deliberation. Because T responded affirmatively to the court's questions, the court did not feel the need to proceed any further. To have proceeded further would have been an abuse of discretion. "That the verdict may have been the result of compromise, or a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters." (Internal quotation marks omitted.) *State* v. *Grant*, 103 Conn. App. 456, 464, 928 A.2d 1247, cert. denied, 284 Conn. 925, 933 A.2d 725 (2007). Furthermore, "[i]t is well established that evidence as to the expressions and arguments of the jurors in their deliberations and evidence as to their own motives, beliefs, mistakes and mental operations generally, in arriving at their verdict is excludable in postverdict proceedings as immaterial. . . . [An] affidavit to avoid the verdict may not be received to show any matter which does essentially inhere in the verdict itself, as that the juror did not assent to the verdict; that he misunderstood the instructions of the court; the statements of the witnesses or the pleadings in the case; that he was unduly influenced by the statements or otherwise of his fellow jurors, or mistaken in his calculations or judgment, or other matter resting alone in the juror's breast." (Citation omitted; internal quotation marks omitted.) *State* v. *Gary*, 273 Conn. 393, 415, 869 A.2d 1236 (2005). T's having been unduly influenced by the statements of a fellow juror

relates to T's motives and mental operations and therefore was irrelevant in the postverdict proceeding and should not have been inquired into by the court.

The court could have inquired more deeply into any extraneous influence on the jurors.[5] In *Aillon* v. *State*, supra, 168 Conn. 550, our Supreme Court stated that jurors could testify "regarding the failure to obey certain essential formalities of juror conduct, i.e., irregularities and misconduct *extraneous to the mental operations* of the jury." (Emphasis added.) Additionally, the court could have inquired more deeply into any allegations of racial bias if they had been present.[6] The conduct at issue in the present case involved discussion among jurors, which was relevant only to their motives and mental operations in reaching a verdict. The court's inquiry was tailored properly to ascertaining this fact. Therefore, the conduct did not involve any extraneous influence on the jurors or allegations of racial bias, and the court did not abuse its discretion by conducting a limited, but sufficient, inquiry.

## III

Third, the defendant claims that the court improperly denied his motion to suppress certain identification testimony. We disagree.

On February 10, 2005, the defendant filed a motion to suppress, inter alia, evidence pertaining to Sweeney's

---

[5] Practice Book § 42-33 provides: "Upon an inquiry into the validity of a verdict, no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror nor any evidence concerning mental processes by which the verdict was determined. Subject to these limitations, a juror's testimony or affidavit shall be received when it concerns any misconduct which by law permits a jury to be impeached." See also General Statutes § 51-245.

[6] See *State* v. *Santiago*, 245 Conn. 301, 340, 715 A.2d 1 (1998) ("we deem it appropriate in all future cases in which a defendant alleges that a juror has made racial epithets . . . that the trial court should conduct a more extensive inquiry").

photographic identification of the defendant as the individual who had shot him. In response, the court held a suppression hearing. At the suppression hearing, Palmieri testified regarding the identification procedure. He stated that he had arranged an array comprised of eight photographs of white males who were similar in appearance to the defendant. He then brought the array to Sweeney in the hospital, asked if he recognized anybody and also informed Sweeney that "there could be someone in there that you might recognize, and there may not be." Palmieri also testified that Sweeney was very certain of his identification of the defendant as the assailant, as was evidenced by his immediately pointing to the defendant's photograph and his physical reaction upon viewing the photograph. After identifying the defendant's photograph, Sweeney began to shake and cry. Sweeney also testified that he was 100 percent certain that he was identifying the man who had shot him. He, too, noted that he had begun to cry upon viewing the photograph of the defendant. On September 21, 2005, the court issued a memorandum of decision in which it denied the defendant's motion to suppress. The court found that "the credible facts establish that the photo array procedure was proper both in its substantive quality as well as the way it was presented to the witness." Furthermore, the court found that "there is nothing in the record to establish any suggestiveness in the photo array or the way it was displayed to the victim."

As a preliminary matter, we set forth the legal principles that guide our resolution of the defendant's claim. "We will reverse the trial court's ruling [on evidence] only where there is an abuse of discretion or where an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling. . . . Because the inquiry into whether evidence of pretrial identification should be suppressed

contemplates a series of factbound determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error." (Internal quotation marks omitted.) *State* v. *Ledbetter*, 275 Conn. 534, 548, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

The defendant argues that the identification procedure was unnecessarily suggestive and that the identification was unreliable. First, he argues that the manner in which the photographic array was assembled was suggestive because the detectives did not tell Sweeney that the defendant may not be included in it, and the police had no description of a suspect on which they could build the photographic array. Additionally, the defendant argues that his photograph was emphasized because no one else who had attended the party on the evening in question was included in the array. Second, the defendant argues that the identification was unreliable for several reasons: Sweeney lacked the opportunity to view his assailant because the shooting happened so quickly, Sweeney's intoxication compromised his ability to observe that night and Sweeney was under the effects of morphine at the time that he made the identification.

"[B]ecause the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable. . . . [T]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless

reliable based on an examination of the totality of the circumstances. . . . To prevail on his claim, the defendant has the burden of showing that the trial court's determinations of suggestiveness and reliability both were incorrect." (Internal quotation marks omitted.) Id., 547–48. Nevertheless, "[i]f the procedures used to identify the defendant were not unnecessarily suggestive, we need not independently analyze whether the identification was reliable." *State* v. *Boscarino*, 204 Conn. 714, 726, 529 A.2d 1260 (1987). "An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification." (Internal quotation marks omitted.) *State* v. *Figueroa*, 235 Conn. 145, 156, 665 A.2d 63 (1995).

In the present case, we conclude that the identification procedure was not unnecessarily suggestive. First, the defendant argues that the identification procedure was unnecessarily suggestive because the detectives did not tell Sweeney explicitly that the defendant may not be included in the array. Palmieri testified at the suppression hearing, however, that he instructed Sweeney that there may or may not be someone in there that you *recognize*, an instruction that serves a purpose similar to that of an instruction that the assailant may not be in the array. Furthermore, although our Supreme Court has approved the idea of "an affirmative warning to witnesses that the perpetrator may or may not be among the choices in the identification procedure"; *State* v. *Ledbetter*, supra, 275 Conn. 574; the court has not mandated that warning as a matter of law.

Next, the defendant argues that the identification procedure was unnecessarily suggestive because the detectives had no description of a suspect from which they could build a photographic array. In *State* v. *White*, 229 Conn. 125, 163, 640 A.2d 572 (1994), as in the present case, the defendant was urging the court "to hold that it is unnecessarily suggestive for the police to assemble

a photographic array from street information without first obtaining a description or other information about the suspect from the victim. [The defendant] claims that doing so is tantamount to telling the victim that the police have developed a suspect through other information and that the suspect is included in the array." Our Supreme Court rejected this argument, however, stating that the procedure is not invalidated "unless the police expressly indicate that a suspect is included in the array." Id. In the present case, as in *White*, the police did not indicate expressly that a suspect was included in the array. Therefore, the compiling of a photographic array without a description did not render the identification procedure unnecessarily suggestive in this case.

Finally, the defendant argues that the detectives emphasized the defendant's photograph because no one included in the array, other than the defendant, had attended the party on the evening in question. The defendant did not present any proof that the lack of other partygoers in the photographic array rendered the identification procedure suggestive. First of all, Sweeney testified that he did not know the defendant's name and, to the best of his knowledge, had not met him prior to identifying him in the photographic array. Second, Sweeney testified that he "recognized [the defendant] as the man who shot [him]." Sweeney never mentioned that he had recognized the defendant from having seen him at the party or even that he had been aware that the defendant had been at the party.

We conclude that the identification procedure in the present case was not unnecessarily suggestive, as it did not give rise to a very substantial likelihood of irreparable misidentification.

## IV

Fourth, the defendant claims that the court improperly failed to hold a *Porter* hearing. Specifically, the

defendant requested a *Porter* hearing to determine whether the testimony of the state's expert firearm and tool mark examiner, Edward Jachimowicz, regarding his comparison between a Makarov magazine recovered from the defendant's home and fired cartridges found at the scene of the shooting, was relevant and supported by a valid methodology.

On February 10, 2005, the defendant filed a motion for a *Porter* hearing. The state opposed the defendant's motion, arguing that the evidence fell within the general category of firearm and tool mark identification, which routinely has been held admissible. In response, the court held an evidentiary hearing. At the hearing, the state called James Stephenson, a forensic expert employed by the state department of public safety in the forensic science laboratory, even though Jachimowicz actually had performed the relevant tool marking tests. The defendant did not call any witnesses. Stephenson testified that firearm and tool mark identification has been an accepted forensic identification procedure for more than one century. Stephenson explained that tool mark examining involves "looking at those striated marks found upon the surfaces or contoured surfaces of an object that's come into contact with a tool. And this is how we're able to make our conclusion as to correspondence to a specific tool." When asked about magazine markings left on cartridge casings, Stephenson explained that a magazine mark is a class mark, which they would examine for the purpose of matching a particular cartridge case to a magazine or to a particular firearm. Stephenson also testified that it was rare for him to testify about magazine markings because a magazine marking rarely comes into consideration when doing firearms identification on the basis of cartridge cases. Usually, the identification of a bullet is done through the ballistics process, and the expert will

focus on the barrel markings, making magazine markings on casings unnecessary. Several times during the cross-examination of Stephenson, defense counsel attempted to inquire into the specific methodology used by Jachimowicz. The court precluded defense counsel from delving too deeply into the specific methodology used, sustaining the state's objection that the specific methodology used pertains to the weight of the evidence and not to the request for a *Porter* hearing.

On September 19, 2005, the court issued a memorandum of decision denying the defendant's motion for a *Porter* hearing. The court held that it "need not conduct a *Porter* type hearing in this case because the scientific principles of ballistics and firearms analysis are very well established and can be admitted on a mere showing [of] relevance." The court then found the evidence to be both reliable and relevant. Jachimowicz testified at trial regarding his findings with respect to some of the items seized. First, he testified that the markings on two casings found at the scene of the shooting indicated that they had, at some point, been loaded into the magazine of the Makarov pistol seized from the defendant's house. Second, Jachimowicz concluded that the bullet casings found at the scene of the shooting had not been fired from the Makarov pistol seized from the defendant's home. His examination of the casings, however, revealed class characteristics, which were consistent with the shells' having been fired from another Makarov pistol. The state also presented evidence that the defendant, at one point, had owned another Makarov pistol. This fact was established through the testimony of two of the defendant's coworkers, who testified that each of them had sold the defendant a Makarov pistol. Furthermore, the state presented evidence, through a police inventory report from 1997, indicating that the defendant was found at that time to have owned a Makarov pistol with a serial number that

did not match the serial number of the Makarov pistol seized from the defendant's home in the most recent search. During Jachimowicz' testimony at trial, the defendant renewed his request for a *Porter* hearing, arguing that the court had not allowed a substantive hearing on the methodology and procedures as they applied to magazine marks. The court, however, denied the defendant's renewed motion.

"It is axiomatic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. In this regard, the trial court is vested with wide discretion in determining the admissibility of evidence. . . . Accordingly, [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Because a trial court's ruling under *Porter* involves the admissibility of evidence, we review that ruling on appeal for an abuse of discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Sorabella*, 277 Conn. 155, 214, 891 A.2d 897, cert. denied, 549 U.S. 821, 127 S. Ct. 131, 166 L. Ed. 2d 36 (2006).

The defendant argues that Jachimowicz' testimony regarding the matching of cartridges to magazines exclusively on the basis of magazine marks should have been subjected to *Porter* scrutiny because it is not generally accepted in the scientific community. Furthermore, the defendant argues that when a subjective methodology is applied, as it was in the present case, the court must determine whether the principles underlying the particular procedure were applied properly to the facts of the case. Additionally, the defendant argues that even if the methodology used in this case was generally accepted, it was subjective, and, therefore, the court had to determine whether it was applied in a reliable manner. Finally, the defendant argues that the lack of recorded methodology and Jachimowicz' failure to record the type of tests he had performed

rendered his testimony "incapable of assisting the jury in any meaningful way because [it] could not independently assess whether his methods were reliable and, thus, his ultimate conclusions valid."

The state argues, and we agree, that the defendant failed to establish that the tool mark identification evidence involved an "innovative scientific technique" and, therefore, that *Porter* does not even apply. In *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), our Supreme Court held that "scientific evidence should be subjected to a flexible test, with differing factors that are applied on a case-by-case basis, to determine the reliability of the scientific evidence." *State* v. *Reid*, 254 Conn. 540, 545, 757 A.2d 482 (2000). The court, however, did not define what constituted "scientific evidence," thereby allowing the courts to maintain some flexibility in applying the test. As a result, a court's initial inquiry should be "whether the [evidence] at issue . . . is the type of evidence contemplated by *Porter*." (Internal quotation marks omitted.) *State* v. *Griffin*, 273 Conn. 266, 276, 869 A.2d 640 (2005). In *Porter*, our Supreme Court noted that "some scientific principles have become so well established that an explicit . . . analysis [under *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)] is not necessary for admission of evidence thereunder. . . . Evidence derived from such principles would clearly withstand a *Daubert* analysis, and thus may be admitted simply on a showing of relevance." (Citation omitted; internal quotation marks omitted.) *State* v. *Porter*, supra, 85 n.30.

In the present case, the court found that it did not have to conduct a *Porter* hearing because the scientific principles of ballistics and firearms analysis are well established. Furthermore, the court held that "[t]ool marking is clearly a science and technology that can

be measured, photographed, calibrated and enlarged." As a result, the court found the evidence both reliable and relevant. In his brief, the defendant attempts to distinguish the process of tool mark identification that involves magazine marks from the general field of tool mark and firearm identification. The court did not abuse its discretion in concluding that the tool marking identification involving magazine marks is reliable and relevant as a part of the broader field of tool mark and firearm identification. There was ample evidence in the record to justify the court's conclusion. On cross-examination, Stephenson stated that "[t]here's only one method used, scientific method that we've all practiced and used within the field of firearms and tool mark identification, and that's the comparison of two sets or more of random marks placed upon the contoured surfaces to compare those to find an agreement, a sufficient agreement between those two surfaces to make an individualization." Furthermore, he stated that "[w]e all follow the same basic theory that an individual tool mark can be specified to an individual tool once we find that pattern agreement upon those surfaces of those two surfaces after we've made a conclusion of looking at those for the relative spatial relationship, size and number and quantity of those striae that are upon those surfaces." Finally, Stephenson testified that "[t]he firearm is a subcategory of tool mark identification. The firearm now becomes a tool. The objects that come—that they come in contact with are the unknown or what you're trying to identify back to the tool, i.e., the bullet to the barrel, the cartridge casing to the magazine, the cartridge case to the firearm, the breach, the extractor, the ejector, the firing pin. Those all become tools that come in contact with those surfaces. And it's all based on an identification of those unique patterns of striated or impressed marks upon those surfaces." Stephenson's testimony reveals that identifying marks

made on the magazine by the cartridge casings is merely a subset of the science of firearm and tool mark identification, which has been well established and admissible evidence under prior case law. See *State* v. *Miles*, supra, 97 Conn. App. 239 (firearm and tool mark examiner testified that bullet recovered from victim had been fired from gun recovered near scene of shooting); *State* v. *Miller*, 95 Conn. App. 362, 367, 896 A.2d 844 (firearm and tool mark examiner testified that two bullets recovered were fired from same firearm, that bullet fragments recovered were consistent with being fired from same type of firearm as those two bullets and that four, nine millimeter cartridges were fired from same firearm), cert. denied, 279 Conn. 907, 901 A.2d 1228 (2006). Because identifying the magazine markings is a subset of the well established and admissible science and practice of firearm and tool mark identification, the court did not have to subject evidence related thereto to a *Porter* hearing. As a result, we conclude that the court did not abuse its discretion in refusing to hold a *Porter* hearing.

V

Finally, the defendant claims that the court improperly consolidated the two informations for trial. We disagree.

The following factual and procedural history is relevant to the disposition of the defendant's claim. In docket number CR04-0022869-T, the defendant was charged with attempt to commit murder, assault in the first degree, criminal possession of a pistol, criminal use of a firearm and illegal possession of a weapon in a motor vehicle. In docket number CR04-0023326-T, the defendant was charged with two counts of criminal possession of a pistol and possession of marijuana. The state filed a motion to consolidate the two informations for trial, and the defendant filed a motion objecting to

consolidation. In support of his motion, the defendant argued that consolidating the two informations for trial would prejudice him significantly at trial. After considering the arguments and other relevant factors, the court granted the state's motion, and the two informations were consolidated for trial.

General Statutes § 54-57 provides: "Whenever two or more cases are pending at the same time against the same party in the same court for offenses of the same character, counts for such offenses may be joined in one information unless the court orders otherwise." See also Practice Book § 41-19. "In deciding whether to sever informations joined for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb. . . . The defendant bears a heavy burden of showing that the denial of severance resulted in substantial injustice, and that any resulting prejudice was beyond the curative power of the court's instructions. . . . [B]ecause joinder foster[s] economy and expedition of judicial administration . . . we consistently have recognized a clear presumption in favor of joinder and against severance . . . and, therefore, absent an abuse of discretion, we will not second guess the considered judgment of the trial court as to joinder or severance of two or more charges. . . .

"A court's discretion regarding joinder, however, is not unfettered. The determination to try a defendant jointly on charges arising from separate cases may only be reached if consistent with the defendant's right to a fair trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Bell*, 93 Conn. App. 650, 654–55, 891 A.2d 9, cert. denied, 277 Conn. 933, 896 A.2d 101 (2006).

In *State* v. *Boscarino*, supra, 204 Conn. 714, our Supreme Court identified several factors that a trial court should consider in making its determination of

whether severance is required. "These factors include: (1) whether the charges involve discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . If any or all of these factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred." (Internal quotation marks omitted.) *State* v. *Ellis*, 270 Conn. 337, 375, 852 A.2d 676 (2004). In the present case, the charges involved discrete, easily distinguishable factual scenarios. The events involving the assault were readily distinguishable from those involving the search of the defendant's home, and, therefore, the jury would not have been confused by the consolidation of the two factual scenarios. Furthermore, the defendant conceded in his brief that the crimes were not brutal or shocking and that the trial was not lengthy. There were no *Boscarino* factors present that would have led the court to refuse to consolidate the two informations.

The defendant makes other arguments, however. He argues that consolidation prejudiced him for two reasons. First, the number of charges introduced at trial would have caused the jury to assume the defendant must have done something wrong. Second, the fact that the jury was aware that the defendant possessed several firearms illegally would have caused the jury to assume that he was a violent individual and was, therefore, more likely to be the shooter. Additionally, the defendant argues that the evidence from the search of his home, including the several firearms, ammunition and marijuana, was not relevant and would not have been admissible in the case involving the shooting. Finally, the defendant argues that the court never instructed the jury on the relevance of such evidence or limited its consideration of it.

We do not find these arguments persuasive. First, the state argues, and we agree, that the defendant's possession of several firearms is evidence that would have been admissible in the case involving the assault due to the state's need to demonstrate the defendant's prior possession of at least two Makarov pistols. Additionally, the evidence regarding the seizure of the Makarov ammunition was relevant to and admissible in the case involving the assault. The state used the ammunition recovered from the defendant's home, in addition to the victim's identification of the defendant, to connect the defendant to the scene of the shooting. "Where evidence of one incident can be admitted at the trial of the other, separate trials would provide the defendant no significant benefit." (Internal quotation marks omitted.) *State* v. *McKenzie-Adams*, 281 Conn. 486, 520, 915 A.2d 822, cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007). In the present case, a significant portion of the evidence seized from the defendant's home, which led to the charges in the second information, would have been admissible in the case involving the assault. Therefore, separate trials for each information would not have provided the defendant with any benefit.

Additionally, the defendant argues that evidence of his illegal possession of firearms would have led the jury to believe that he was a violent person. The jury, however, returned a verdict of not guilty with respect to the attempt to commit murder charge from the first information. This not guilty verdict with respect to the most serious charge demonstrates that the jury was able to consider the charges separately. See *State* v. *Rodriguez*, 91 Conn. App. 112, 120–21, 881 A.2d 371 ("Although the jury found the defendant guilty of all the counts of burglary, attempt to commit burglary, larceny and criminal trespass that it considered, it found the defendant not guilty of one count of breach of the

peace in the second degree. That acquittal demonstrated that the jury was able to consider each count separately and, therefore, was not confused or prejudiced against the defendant."), cert. denied, 276 Conn. 909, 886 A.2d 423 (2005); *State* v. *Atkinson*, 235 Conn. 748, 766, 670 A.2d 276 (1996) ("[m]oreover, by returning a verdict of not guilty on the charge of possession of a weapon in a correctional institution . . . the jury evidently was able to separate the two cases and did not blindly condemn the defendant on his participation in the murder"). Because it has not been shown that separate trials would have benefited the defendant and it appears that the jury considered the charges separately, we conclude that the court did not abuse its discretion in consolidating the two informations for trial.

Finally, the defendant argues that the court neither instructed the jury that most of the evidence seized pursuant to the warrant was relevant only to the firearms case nor limited their consideration of it. As the state pointed out in its brief, however, the defendant did not ask for such a charge from the court. Nevertheless, the court did make certain statements during the charge, which served to negate any prejudice that may have resulted from the consolidation of these cases. First, the court stated that "[y]ou must not consider the information as any evidence whatsoever of the guilt of the defendant or draw an [inference] of guilt because he has been charged with a crime." Additionally, the court stated that "[i]t is your duty to consider each charge or count separately." The court also made it clear numerous times that to obtain a conviction of any crime charged, the state had the burden of proving beyond a reasonable doubt every material element of that crime.

The judgments are affirmed.

In this opinion the other judges concurred.