******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* DONALD RAYNOR
## (AC 41018)

Keller, Elgo and Eveleigh, Js.

*Syllabus*

Convicted of the crime of murder in connection with the shooting death of the victim, the defendant appealed. On appeal, he claimed, inter alia, that the trial court improperly denied his motion in limine in which he sought to exclude or to limit the scope of the testimony of S, the state's expert witness on firearm and toolmark identification. Specifically, he claimed that because recent studies and reports had established that the methodology underlying firearm and toolmark identification was not sufficiently reliable, the court improperly denied his request for a hearing, pursuant to *State* v. *Porter* (241 Conn. 57), to determine the reliability of firearm and toolmark identification. *Held*:

1. The trial court did not abuse its discretion by denying the defendant's motion in limine to exclude or limit S's testimony and request for a *Porter* hearing: a *Porter* hearing to determine the validity of firearm and toolmark identification was not required, as this court previously has determined that the science of firearm and toolmark identification is well established, and although this court's prior decision predated certain reports and studies, and other certain sources that questioned the validity of firearm and toolmark identification, those sources did not overrule or otherwise abrogate the controlling case law in this state; moreover, although the testimony of S included the flaws and criticisms of firearm and toolmark identification, to which the jury was free to give as much or as little weight as it saw fit, the defendant did not proffer his own expert witness to testify that the science of firearm and toolmark identification was not reliable.

2. The defendant could not prevail on his claim that the trial court improperly granted the state's motion for the admission of uncharged misconduct evidence related to a shooting that occurred eight months after the shooting of the victim, the trial court not having abused its discretion in determining that the probative value of the uncharged misconduct evidence outweighed its prejudicial effect; the admission of the uncharged misconduct evidence did not unduly arouse the jury's emotions because the uncharged misconduct, which involved an attempted shooting that did not result in any deaths or injuries, was much less severe than the charged conduct, which involved the shooting death of the victim, the admission of the uncharged misconduct evidence did not create a distracting side issue, as the evidence admitted linked an assault rifle and the perpetrator of the uncharged shooting to the murder at issue in the present case, the presentation of evidence related to the attempted shooting did not take up an inordinate amount of time, the defendant was not unfairly surprised by the admission of the uncharged misconduct evidence, as it was admitted in the defendant's prior trial, which had resulted in a mistrial, and the state had filed a pretrial motion for admission of uncharged misconduct evidence, and any possible prejudice was further mitigated by the trial court's limiting instructions that the uncharged misconduct evidence was being admitted solely to establish the identity of the person who committed the crimes alleged and the availability of the means to commit those crimes.

Argued January 31—officially released May 8, 2018

*Procedural History*

Substitute information charging the defendant with the crime of murder, brought to the Superior Court in the judicial district of Hartford and tried to the jury before the court, *Kwak, J.*; verdict and judgment of guilty, from which the defendant appealed. *Affirmed.*

*Andrew O'Shea*, with whom was *Damon Kirsch-*

*baum*, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Patrick Griffin*, state's attorney, for the appellee (state).

*Opinion*

EVELEIGH, J. The defendant, Donald Raynor, appeals from the judgment of conviction, rendered following a jury trial, of murder in violation of General Statutes § 53a-54a (a). On appeal, the defendant claims that the trial court (1) improperly denied the defendant's motion in limine to exclude or limit the scope of the testimony of the state's expert witness on firearm and toolmark identification, and (2) abused its discretion by granting the state's motion for uncharged misconduct related to a shooting that occurred approximately eight months after the events of this case. We disagree and, accordingly, affirm the judgment of the trial court.

The following facts, which a jury reasonably could have found, and procedural history are relevant to this appeal. The defendant and Jose Rivera[1] were members of the Money Green Bedrock (Bedrock) street gang in Hartford. The victim was a member of The Avenue, another Hartford street gang. Bedrock and The Avenue are rival gangs, and the defendant and Rivera viewed members of The Avenue as "the enemy." Prior to the events giving rise to this case, there were two incidents between the rival gangs involving the defendant and the victim. The first incident involved the victim firing shots at the defendant and another Bedrock member. The second incident, which occurred approximately one week prior to the events of this case, involved the victim spotting the defendant and Rivera on The Avenue's territory and subsequently taking a picture of the defendant's vehicle leaving the area. Following the second incident, the defendant stated to Rivera that the victim "had to go," which Rivera understood to mean that the victim "had to get killed for what he did."

During the early morning hours of June 18, 2007, the defendant called Rivera and stated that he wanted to find members of The Avenue and test out a .223 caliber assault rifle. Rivera understood this to mean that, "[b]asically, he wanted to go look [for] and kill somebody." The defendant picked up Rivera and drove to a parking lot located behind Bedford Street where there was an abandoned vehicle in which the defendant and Rivera stored guns and drugs. The defendant then put on latex gloves, removed a .223 caliber assault rifle from the trunk of the abandoned vehicle, and loaded the rifle. The defendant and Rivera then got back into the vehicle that they were driving; Rivera drove the vehicle and the defendant sat in the backseat.

Rivera drove the vehicle around areas that he and the defendant knew were frequented by members of The Avenue. While Rivera was driving on Enfield Street, he informed the defendant that he saw the victim standing on the sidewalk having a conversation with a woman. The defendant instructed Rivera to go around

the block, and Rivera complied. As Rivera turned back onto Enfield Street, he lowered the back window and began to slow down. As the vehicle approached the victim and the woman, the defendant hung out the back window and began shooting at the victim. The victim attempted to run away but made it only three steps before he fell to the ground. The defendant continued to fire at the victim while he was on the ground. He fired at least ten to fifteen shots at the victim, who died as a result of gunshot wounds to the chest and neck.

In 2008, the police recovered a .223 Kel-Tec assault rifle in an unrelated investigation. In 2011, Rivera gave a statement to the police in which he confessed to his involvement in the victim's murder and implicated the defendant. Rivera also identified the .223 Kel-Tec assault rifle that the police had recovered in 2008 as the weapon that the defendant used to shoot the victim. In 2014, the defendant was charged, in a long form information, with murder in violation of § 53a-54a (a), conspiracy to commit murder in violation of § 53a-54a (a) and General Statutes § 53a-48 (a), and criminal use of a firearm in violation of General Statutes § 53a-216 (a). A trial on these charges commenced in September, 2014, and ended in a mistrial because the jury was unable to reach a verdict. A second trial commenced in March, 2015, in which the defendant was charged only with one count of murder in violation of § 53a-54a (a). The jury found the defendant guilty, and the court sentenced him to a total effective sentence of sixty years of imprisonment. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant's first claim on appeal is that the court abused its discretion by denying his motion in limine in which he sought to exclude or limit the scope of the testimony of James Stephenson, the state's expert firearm and toolmark examiner. The defendant raises the following arguments in support of this claim: (1) recent studies have established that the methodology underlying firearm and toolmark identification is not sufficiently reliable; (2) the court improperly denied his request for a hearing pursuant to *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), to determine the reliability of firearm and toolmark identification; (3) the court improperly allowed Stephenson to opine that various cartridge casings recovered from the crime scene were fired from a particular firearm; and (4) the court improperly denied his motion to limit the scope of Stephenson's testimony. We disagree.

"It is axiomatic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. In this regard, the trial court is vested with wide discretion in determining the admissibility of evidence. . . .

Accordingly, [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Because a trial court's ruling under *Porter* involves the admissibility of evidence, we review that ruling on appeal for an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Legnani*, 109 Conn. App. 399, 418, 951 A.2d 674, cert. denied, 289 Conn. 940, 959 A.2d 1007 (2008).

"In [*Porter*], our Supreme Court held that scientific evidence should be subjected to a flexible test, with differing factors that are applied on a case-by-case basis, to determine the reliability of the scientific evidence. . . . The court, however, did not define what constituted scientific evidence, thereby allowing the courts to maintain some flexibility in applying the test. As a result, a court's initial inquiry should be whether the [evidence] at issue . . . is the type of evidence contemplated by *Porter*. . . . In *Porter*, our Supreme Court noted that some scientific principles have become so well established that an explicit . . . analysis [under *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)] is not necessary for admission of evidence thereunder. . . . Evidence derived from such principles would clearly withstand a *Daubert* analysis, and thus may be admitted simply on a showing of relevance." (Citations omitted; internal quotation marks omitted.) *State* v. *Legnani*, supra, 109 Conn. App. 419.

The following additional facts and procedural history are relevant to the resolution of this claim. Prior to Stephenson's testimony, the defendant filed a motion in limine in which he requested a *Porter* hearing to determine whether the methodology underlying firearm and toolmark identification was reliable. In the alternative, the defendant sought to limit Stephenson's testimony so that he could not state his conclusions to a particular degree of certainty but, instead, would have been required to state that his conclusions were "merely more likely than not . . . correct." In support of his request for a *Porter* hearing, the defendant relied on multiple studies that called into question the scientific validity of firearm and toolmark identification.[2] The defendant also relied upon *United States* v. *Glynn*, 578 F. Supp. 2d 567 (S.D.N.Y. 2008), to support his alternative argument that the scope of Stephenson's testimony should be limited to opining that his conclusions were "more likely than not" correct.[3]

Following argument on the motion, the court denied the defendant's motion in limine and request for a *Porter* hearing, relying on *State* v. *Legnani*, supra, 109 Conn. App. 399. The court reasoned that firearm and toolmark evidence is "forensic science [that] has been well established, and we have a case, [*Legnani*] . . . which stands for the proposition that this is not a new science. Therefore, a *Porter* hearing is not necessary." The court

also denied the defendant's request to limit Stephenson's testimony to state that his conclusions were "more likely than not . . . correct."

Stephenson subsequently testified before the jury that it was possible to determine whether the bullets or cartridge casings recovered from a crime scene could be identified as having been fired from a particular firearm. In fact, twelve of the fifteen cartridge casings recovered from the Enfield Street shooting were "positively matched" to the .223 Kel-Tec assault rifle that Rivera had identified as the firearm that the defendant used to shoot the victim. Although the three remaining cartridge casings were the same size and weight as a .223 caliber shell casing and contained similar toolmarks, there was not sufficient detail for a positive identification to the particular firearm in evidence. The examiner determined that the three remaining cartridge casings produced inconclusive results.

Stephenson also testified regarding the Association of Firearm and Tool Mark Examiners (association) and its theory of identification. The association's theory of identification is generally accepted in the science of firearm and toolmark identification, and the Connecticut Forensic Science Laboratory follows the guidelines from this theory. Stephenson conceded, however, that recent studies and reports have critiqued the science of firearm and toolmark identification. Stephenson testified regarding the NAS Report and the Ballistic Imaging studies; see footnote 2 of this opinion; and explained that he viewed some, but not all, of the critiques in those studies as valid. Defense counsel also highlighted the ways in which firearm and toolmark identification does not follow precisely the scientific method—i.e., by not protecting against confirmation bias—and that the association's theory of identification is not a completely objective theory.

On appeal, the defendant claims that the court abused its discretion by denying his motion in limine and request for a *Porter* hearing. The defendant argues that the NAS Report and the Ballistic Imaging studies establish that the methodology underlying firearm and toolmark identification is not reliable, and as a result, the court should have precluded Stephenson from opining that particular cartridge casings positively matched the firearm in evidence. In the alternative, the defendant argues that the court should have limited Stephenson's testimony so that he could opine only that his conclusions were "more likely than not . . . correct." The state argues that the court properly relied upon *State* v. *Legnani*, supra, 109 Conn. App. 399, in concluding that the admissibility of firearm and toolmark identification evidence is well established and, therefore, properly denied the defendant's motion. We agree with the state.

This court's decision in *Legnani* controls our resolu-

tion of this claim. In *Legnani*, the defendant requested that the trial court hold a *Porter* hearing to determine whether the comparison between a firearm's magazine that was recovered from the defendant's home and fired cartridge casings that were recovered from the crime scene was relevant and supported by a valid methodology. Id., 415–16. The state argued that a *Porter* hearing was not necessary, as the evidence fell within the general category of firearm and toolmark identification, which courts routinely have held admissible. Id., 416. The trial court held an evidentiary hearing—not a *Porter* hearing—during which the state called an expert witness in the field of firearm and toolmark identification. Id. The defendant did not call any witnesses during the evidentiary hearing, and the court subsequently denied the defendant's request for a *Porter* hearing. Id., 417. In so doing, the court stated that it "need not conduct a *Porter* type hearing in this case because the scientific principles of ballistics and firearms analysis are very well established and can be admitted on a mere showing [of] relevance." (Internal quotation marks omitted.) Id.

On appeal, the defendant in *Legnani* argued that the trial court improperly denied his request for a *Porter* hearing. Id., 415. This court noted that "[s]everal times during the cross-examination of [the expert], defense counsel attempted to inquire into the specific methodology used by [the firearm and toolmark examiner]. The court precluded defense counsel from delving too deeply into the specific methodology used, sustaining the state's objection that the specific methodology used pertains to the weight of the evidence and not to the request for a *Porter* hearing." Id., 417. This court concluded that "identifying marks made on the magazine by the cartridge casings is merely a subset of the science of firearm and tool mark identification, *which has been well established and admissible evidence under prior case law.* . . . Because identifying the magazine markings is a subset of the *well established and admissible science and practice of firearm and tool mark identification*, the court did not have to subject evidence related thereto to a *Porter* hearing. As a result, we conclude that the court did not abuse its discretion in refusing to hold a *Porter* hearing." (Citations omitted; emphasis added.) Id., 420–21.

*Legnani* is controlling precedent on the issue of whether the science of firearm and toolmark identification is well established, and thus binds our resolution of this claim.[4] The defendant argues that *Legnani* is inapplicable because it predates the NAS Report, the Ballistic Imaging study, and other sources that question the validity of firearm and toolmark identification. Although *Legnani* was decided prior to these reports being published, these reports do not overrule or otherwise abrogate the existing case law in this state; nor do the district court cases or the cases from other states that the defendant has cited in support of this claim.

More importantly, the defendant did not proffer his own expert witness to testify that the science of firearm and toolmark identification is not reliable.

The evidence admitted during the cross-examination of Stephenson included the flaws and criticisms of firearm and toolmark identification. The jury was free to give this evidence as much or as little weight as it saw fit. See *State* v. *Osbourne*, 138 Conn. App. 518, 533–34, 53 A.3d 284 ("[i]t is axiomatic that it is the jury's role as the sole trier of the facts to weigh the conflicting evidence and to determine the credibility of witnesses" [internal quotation marks omitted]), cert. denied, 307 Conn. 937, 56 A.3d 716 (2012). A *Porter* hearing to determine the validity of firearm and toolmark identification was not required. The state had to establish only that the firearm and toolmark evidence was relevant, which it did. Therefore, we conclude that the court properly relied upon *Legnani*, and did not abuse its discretion by denying the defendant's motion in limine to exclude or limit Stephenson's testimony.

## II

The defendant's second claim on appeal is that the court abused its discretion by granting the state's motion for the admission of uncharged misconduct evidence. The defendant argues that the probative value of the uncharged misconduct evidence was outweighed by the risk of unfair prejudice. The state argues that the court properly admitted the evidence to establish identity and means. We agree with the state.

The following additional facts and procedural history are relevant to the resolution of this claim. Prior to the start of the second trial, the state filed a motion in which it sought to introduce uncharged misconduct evidence related to a shooting on Baltimore Street that had occurred eight months after the shooting of the victim. The state argued that the uncharged misconduct evidence was admissible to establish identity and means. The defendant opposed this motion, arguing that the evidence was more prejudicial than probative because the evidence showed only "that this gun was used on a separate occasion potentially by [the defendant] to shoot at another person that he's not charged with [shooting] in this case. . . . It's the very sort of thing that yields the prejudice/probative . . . calculus . . . in the prohibition against propensity evidence. . . . [W]e think the state has everything it needs to prove the manner and means of the homicide as charged, [and] that to introduce another shooting, the gun charged in this case, is prejudicial, and in mar of the propensity of evidence rule." The court granted the state's motion for uncharged misconduct on the basis of its interpretation of the rules of evidence,[5] and concluded that evidence of the Baltimore Street shooting fell within the identity and means exceptions of § 4-5 (c) of the Connecticut Code of Evidence.[6]

At trial, Deborah Parker, the target of the Baltimore Street shooting, testified that at approximately 2:30 a.m., on February 16, 2008, she and Daryl Spence returned to their residence on Baltimore Street in Hartford, where they resided with their two sons. As Parker and Spence prepared to exit their vehicle, Parker noticed two men walking in the street. As the men approached, one man fired a handgun in Parker's direction. The other man then raised a rifle and began firing it in Parker's direction. Parker took cover underneath a vehicle and Spence ran away to hide elsewhere. Parker saw the faces of both shooters, which were made visible due to the streetlight. She also noticed that the man with the rifle was wearing white or light colored gloves. Neither Parker nor Spence was injured.

Later that morning, Parker's sons were looking online through pictures of a concert that they had attended the night before. While Parker was passing by, she saw on the computer screen a photograph of two men, whom she recognized as the men who had shot at her just hours before. She identified the defendant as the man who had shot the rifle in her direction. Parker testified that she called the detective who was assigned to investigate the shooting to report the identity of the shooters. Because the detective never got back to her, however, she "left the whole situation alone."

In August, 2011, Parker met with a cold case detective in Hartford to review photographs related to the Baltimore Street shooting. During this meeting, Parker identified the defendant's picture in a photographic array and circled it to indicate that he was involved in the shooting. In a separate photographic array, Parker identified the second shooter as an individual named Ezekiel.

Stephenson testified regarding the cartridge casings that were recovered from the Baltimore Street shooting. There were twenty-two cartridge casings recovered, seventeen of which were positively matched to the .223 Kel-Tec assault rifle that Rivera identified as the firearm the defendant had used in the Enfield Street shooting. See part I of this opinion.

On appeal, the defendant does not challenge the court's conclusion that the uncharged misconduct evidence was relevant to establish identity and means. Accordingly, the only question we must resolve with respect to this claim is whether the court abused its discretion in concluding that the probative value of the uncharged misconduct evidence outweighed its prejudicial effect. The defendant argues that the evidence is more prejudicial than probative because "Parker's identification of the defendant was exceedingly unreliable," that the similarities between the charged and uncharged conduct render admission of the uncharged misconduct overly prejudicial, and that the uncharged misconduct

evidence painted the defendant as a "deranged gunman." We disagree.

"[A]s a general rule, evidence of prior misconduct is inadmissible to prove that a criminal defendant is guilty of the crime of which the defendant is accused. . . . Such evidence cannot be used to suggest that the defendant has a bad character or a propensity for criminal behavior. . . . On the other hand, evidence of crimes so connected with the principal crime by circumstance, motive, design, or innate peculiarity, that the commission of the collateral crime tends directly to prove the commission of the principal crime, is admissible. The rules of policy have no application whatever to evidence of any crime which directly tends to prove that the accused is guilty of the specific offense for which he is on trial. . . . We have developed a two part test to determine the admissibility of such evidence. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions [set forth in § 4-5 (b) of the Connecticut Code of Evidence].[7] . . . Second, the probative value of the evidence must outweigh its prejudicial effect. . . . Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only whe[n] abuse of discretion is manifest or whe[n] an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling. . . .

"The well established exceptions to the general prohibition against the admission of uncharged misconduct [evidence] are set forth in § 4-5 (b) of the Connecticut Code of Evidence, which provides in relevant part that [e]vidence of other crimes, wrongs or acts of a person is admissible . . . to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony." (Citation omitted; footnote added; internal quotation marks omitted.) *State* v. *Collins*, 299 Conn. 567, 582–83, 10 A.3d 1005, cert. denied, 565 U.S. 908, 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011).

"In determining whether the prejudicial effect of otherwise relevant evidence outweighs its probative value, we consider whether: (1) . . . the facts offered may unduly arouse the jury's emotions, hostility or sympathy, (2) . . . the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) . . . the evidence offered and the counterproof will consume an undue amount of time, and (4) . . . the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." (Internal quotation marks omitted.) Id., 586–87.

Our Supreme Court's decision in *State* v. *Collins*, supra, 299 Conn. 567, guides our resolution of this claim.

In *Collins*, the trial court admitted evidence of uncharged misconduct related to another shooting in which the defendant allegedly was involved. Id., 569–70, 580. The state's firearm and toolmark examiner testified that cartridge casings recovered from the scene of the murder at issue were fired from the same weapon that had been used in the uncharged crime. Id., 572. The state argued that such evidence was admissible because "it linked a gun owned and used by the defendant [in the uncharged shooting] to the shooting of [the victim] in this case." Id., 577. The defendant argued that the admission of such evidence was "highly prejudicial and of little probative value," and that the evidence "would inflame the jury" due to the similarities between the charged and uncharged shootings. (Internal quotation marks omitted.) Id., 574–75.

On appeal, this court agreed that the trial court abused its discretion in admitting the uncharged misconduct evidence and reversed and remanded the case for a new trial. Id., 576. The state appealed to our Supreme Court, which reversed this court's judgment. Id., 586. In so doing, the court noted, inter alia, that "[u]ncharged misconduct evidence has been held not unduly prejudicial when the evidentiary substantiation of the vicious conduct, with which the defendant was charged, far outweighed, in severity, the character of his prior misconduct." (Internal quotation marks omitted.) Id., 588. The court also stated that it found "significant in mitigating any possible prejudice the limiting instructions . . . given by the trial court both during the testimony of relevant witnesses and during the final jury charge, which we presume the jury to have followed in the absence of any indication to the contrary." Id., 590. In addition, the court cited "numerous other [decisions from] federal and state courts that have rejected challenges, founded on undue prejudice, to the use of uncharged misconduct evidence in cases wherein the charged offenses were committed using the same gun that the defendant had utilized in [the uncharged] prior shootings." Id.

Here, the severity of the charged conduct outweighed the severity of the uncharged conduct. The charged conduct derived from the drive-by shooting of the victim, which resulted in the death of the victim. The uncharged conduct derived from the attempted shooting of Parker and Spence, and did not result in any deaths or even any injuries. Cf. id., 588 (uncharged conduct related to prior, less severe shooting found admissible, where defendant charged with murder, felony murder, and robbery in first degree in connection with shooting death).

Additionally, the court in the present case gave the jury limiting instructions on three occasions: (1) prior to the state first presenting evidence of the Baltimore Street shooting; (2) following Parker's testimony; and

(3) during its final charge to the jury. These limiting instructions provided, inter alia, that the uncharged misconduct evidence was being admitted "solely to show or establish [the] identity of the person who committed the crimes alleged in this information, and the availability of the means to commit those crimes."[8]

On the basis of our review of the record, we conclude that the court did not abuse its discretion in determining that the probative value of the uncharged misconduct evidence outweighed its prejudicial effect. Although the facts of the uncharged misconduct involved the defendant attempting to shoot Parker and Spence, they were much less severe than those of the charged conduct and, therefore, admission of the uncharged misconduct evidence cannot be said to have unduly aroused the jury's emotions. Nor can we say that admission of the uncharged misconduct evidence created a distracting side issue, as the evidence admitted linked the rifle and the perpetrator of the uncharged shooting to the murder at issue in this case. Additionally, the presentation of evidence related to the Baltimore Street shooting did not take up an inordinate amount of time, as the presentation of the uncharged misconduct evidence comprised at most one and one-half days of a six day trial.[9] Finally, the defendant was not unfairly surprised by the admission of this evidence, as it was admitted in the defendant's first trial and the state filed a pretrial motion for the admission of uncharged misconduct evidence. Accordingly, we conclude that the court did not abuse its discretion by admitting the uncharged misconduct evidence related to the Baltimore Street shooting.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Rivera pleaded guilty to one count of conspiracy to commit murder in violation of General Statutes §§ 53a-54a (a) and 53a-48 in connection with the murder of the victim in this case. See *State* v. *Rivera*, Superior Court, judicial district of Hartford, Docket No. CR-13-0670080-T (August 4, 2015).

[2] One such study was the Committee on Identifying the Needs of the Forensic Sciences Community, National Research Council, "Strengthening Forensic Science in the United States: A Path Forward," (2009), available at https://www.ncjrs.gov/pdffiles1/nij/grants/228091.pdf (last visited April 30, 2018) (NAS Report). The NAS Report explained that "[b]ecause not enough is known about the variabilities among individual tools and guns, we are not able to specify how many points of similarity are necessary for a given level of confidence in the result. Sufficient studies have not been done to understand the reliability and repeatability of the methods." Id., 154. The study added that "[a]lthough some studies have been performed on the degree of similarity that can be found between marks made by different tools and the variability in marks made by an individual tool, the scientific knowledge base for toolmark and firearms analysis is fairly limited." Id., 155.

Another such study was the Committee to Assess the Feasibility, Accuracy, and Technical Capability of a National Ballistics Database, "Ballistic Imaging," (2008), available at http://www.nap.edu/catalog/12162.html (last visited April 30, 2018) (Ballistic Imaging). The Ballistic Imaging study found that "[t]he validity of the fundamental assumptions of uniqueness and reproducibility of firearms-related toolmarks has not yet been fully demonstrated." (Emphasis omitted.) Id., 3.

[3] The court in *United States* v. *Glynn*, supra, 578 F. Supp. 2d 567, stated that "ballistics examination not only lacks the rigor of science but suffers from greater uncertainty than many other kinds of forensic evidence. Yet its methodology has garnered sufficient empirical support as to warrant its

admissibility. . . . The problem is how to admit it into evidence without giving the jury the impression . . . that it has greater reliability than its imperfect methodology permits. The problem is compounded by the tendency of ballistics experts . . . to make assertions that their matches are certain beyond all doubt, that the error rate of their methodology is zero, and other such pretensions. Although effective cross-examination may mitigate some of these dangers, the explicit premise of *Daubert* and *Kumho Tire* [*Co., Ltd.* v. *Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)] is that, when it comes to expert testimony, cross-examination is inherently handicapped by the jury's own lack of background knowledge, so that the [c]ourt must play a greater role, not only in excluding unreliable testimony, but also in alerting the jury to the limitations of what is presented." (Citation omitted; internal quotation marks omitted.) *United States* v. *Glynn*, supra, 574. The court ordered that any testimony from the ballistics expert would be limited to "only that a firearms match was more likely than not . . . ." (Internal quotation marks omitted.) Id., 574–75.

[4] The defendant urges this court to overrule *Legnani*. "[T]his court's policy dictates that one panel should not . . . reverse the ruling of a previous panel. The reversal may be accomplished *only* if the appeal is heard en banc." (Emphasis added; internal quotation marks omitted.) *Boccanfuso* v. *Conner*, 89 Conn. App. 260, 285 n.20, 873 A.2d 208, cert. denied, 275 Conn. 905, 882 A.2d 668 (2005). On November 27, 2017, the defendant filed a motion for consideration en banc, which this court denied on January 10, 2018. Additionally, the entire court has not ordered that this case be considered en banc pursuant to Practice Book § 70-7 (b), nor are we persuaded that en banc review is warranted. Therefore, we will not overrule *Legnani*.

We do acknowledge, however, that there has been some evolvement in the field of firearm and toolmark identification since this court decided *Legnani*. As the defendant pointed out before the trial court and in his briefs to this court, recent studies and cases have questioned the scientific validity of firearm and toolmark identification. We are familiar with the findings and conclusions of the NAS Report and the Ballistic Imaging studies, which explain the limitations that exist in the science of firearm and toolmark identification; see footnote 2 of this opinion; as well as the holding of *United States* v. *Glynn*, supra, 578 F. Supp. 2d 567, which limited the scope of the testimony regarding firearm and toolmark identification in that case. See footnote 3 of this opinion; see also *State* v. *Burton*, Superior Court, judicial district of New Haven, Docket No. CR-14-0150831-S (February 1, 2017) (court applied *Legnani* in ruling that firearm and toolmark identification evidence is reliable and not subject to *Porter*, but limited testimony of state's firearm and toolmark identification expert to be that recovered cartridge casing was *consistent* with being fired from particular firearm, and expert could not opine that recovered casing was *match* to particular firearm). Defense counsel also extensively cross-examined Stephenson regarding the recent criticisms of firearm and toolmark identification, during which Stephenson acknowledged the validity of at least some of those criticisms. Even if we were inclined to review the scientific validity of firearm and toolmark identification—and therefore inclined to review the holding of *Legnani*— the circumstances of the present case do not warrant a departure from our precedent. The defendant has not proffered his own expert to rebut the notion that firearm and toolmark evidence is sufficiently reliable as to be admitted without first requiring a *Porter* hearing. Therefore, we adhere to our precedent that holds that the admissibility of firearm and toolmark identification is well established.

[5] The court also noted that its decision was based, in part, on the law of the case doctrine, as the evidence had been admitted in the defendant's first trial.

[6] On three occasions, the court gave the jury a limiting instruction regarding the use of the uncharged misconduct evidence.

[7] When *State* v. *Collins*, 299 Conn. 567, 10 A.3d 1005, cert. denied, 565 U.S. 908, 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011), was decided, the 2009 edition of the Connecticut Code of Evidence was applied in that case. In the 2009 edition, the exceptions to the propensity of the evidence rule were found in § 4-5 (b). By the time of the trial in the present case, however, a new edition of the Code of Evidence had been released, and § 4-5 (b) has been transferred to § 4-5 (c).

[8] "In the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them." (Internal quotation marks omitted.) *State* v. *Santiago*, 269 Conn. 726, 762, 850 A.2d 199 (2004).

[9] In addition, as the state notes, three of the witnesses who testified

about the uncharged Baltimore Street shooting testified primarily about the charged conduct.

------------------------------------------